AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
                                                                                    .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

JS 44 (Rev. ___) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Reg. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):

a) Re-filed Case ☐ YES ☐ NO  b) Related Cases ☐ YES ☐ NO

JUDGE _____  DOCKET NUMBER _____

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD _____  DATE _____

FOR OFFICE USE ONLY

AMOUNT _____  RECEIPT # _____  IFP _____

　
# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.      (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

(d) Choose one County where Action Arose.

**II.      Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.      Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.      Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.      Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States District Courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

<span style="color:red">Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.</span>

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.      <span style="color:red">Related/Refiled Cases.</span>** <span style="color:red">This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.</span>

**VII.      Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**      Example:      U.S. Civil Statute: <u>47 USC 553</u>
Brief Description: <u>Unauthorized reception of cable service</u>

**VIII.      Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK, | Case No. |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| ATTORNEYS' TITLE INSURANCE FUND, INC. | |
| Defendant. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Federal Deposit Insurance Corporation ("FDIC"), as Receiver for Washington Mutual Bank, FSB ("FDIC-R" or "Plaintiff"), through its undersigned counsel, brings this action against Defendant Attorneys' Title Insurance Fund, Inc. ("ATIF" or "Defendant").

## INTRODUCTION

1.     The FDIC-R brings this action to enforce commitments ATIF made in Closing Protection Letters ("CPLs") it issued to Washington Mutual Bank ("WaMu") in connection with fourteen residential real estate transactions (the "Transactions") financed by WaMu.

2.     In each Transaction, the closing agents were approved and authorized issuing agents or approved attorneys of ATIF ("ATIF's Agents").  ATIF's Agents were authorized to issue its title insurance policies.

3.     In exchange for compensation, and to encourage WaMu to use and trust ATIF's Agents with handling its funds and documents at closings, ATIF issued CPLs to WaMu.  In the CPLs, ATIF promised to reimburse WaMu for any "actual loss" arising out of the fraudulent or

1

dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by ATIF's Agents in connection with closing the Transactions.

4.    ATIF's Agents in fact fraudulently and dishonestly handled documents and stole WaMu's funds.  Specifically, ATIF's Agents misappropriated WaMu's funds, and disbursed those funds in a manner contrary to WaMu's instructions.

5.    Even though ATIF's Agents engaged in the precise fraud, dishonesty, and failure to comply with WaMu's closing instructions as covered by the CPLs, and despite the FDIC-R's demands that ATIF honor its promises in the CPLs, ATIF has refused to do so, resulting in millions of dollars of past and continuing losses to the FDIC-R.

**PARTIES, JURISDICTION & VENUE**

6.    The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*  The FDIC is headquartered in Washington, D.C.  On September 25, 2008, the Office of Thrift Supervision ("OTS") closed WaMu and duly appointed FDIC as its receiver.  Plaintiff FDIC-R brings this case in its capacity as WaMu's Receiver under authority granted it in 12 U.S.C. § 1821.  As receiver, FDIC-R acquired all rights, titles, powers and privileges of WaMu. *See* 12 U.S.C. § 1821(d)(2).  Accordingly, the FDIC-R has standing to prosecute this action as Receiver of WaMu.

7.    Defendant ATIF is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Orlando, Florida.  At all times, ATIF was authorized to do business, and was in fact doing business, in the State of Florida as a title insurance underwriter.

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 because it is a civil action commenced by the FDIC-R, which, for purposes of § 1345, is an agency of the United States.  In addition, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because all cases to which the FDIC-R is a party are deemed to arise under the laws of the United States, pursuant to 12 U.S.C. § 1819(b)(2)(A).

9.     Venue is proper in this forum under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in this District, and thirteen of the fourteen properties at issue in the Transactions are situated in this District.

## BACKGROUND

10.     Title insurers such as ATIF issue title insurance policies to lenders as a required part of financed residential real estate transactions.  These title insurance policies protect the lender from, among other things, defects in title on the property securing the loan.

11.     Residential loan transactions are customarily consummated by a closing agent, who is responsible for ensuring that the transactions are completed in accordance with the terms and manner approved by the lender, as a condition of providing the funds.  The loan funds are entrusted to the closing agent, along with the duty to execute and record essential documents and instruments and to disburse funds necessary to complete the transaction, all as directed by the lender.

12.     ATIF issues its title insurance for real estate transactions in Florida through issuing agents or approved attorneys selected by ATIF.  ATIF's issuing agents or approved attorneys often simultaneously serve as closing agents for the transaction in which they issue ATIF's title insurance products.  In that role, ATIF's closing agents are entrusted by lenders with

3

their funds and documents, to act with all the obligations of a closing agent, and to act in exact accordance with the closing instructions provided by the lender.

13.     In order to induce the lender to entrust its closing agent with the loan funds and documents, ATIF issues a closing protection letter, or "CPL," to the lender.  Through the CPL, ATIF promises that it will reimburse the lender for any actual loss arising from the fraud or dishonesty of ATIF's issuing agents or approved attorneys when they serve as the closing agent for the transaction.  Through the promises contained in the CPL, ATIF facilitates and encourages the use of its issuing agents or approved attorneys as closing agents, and agrees to protect the lender in the event of misconduct by one of these closing agents.

14.     In each of the Transactions, ATIF's Agents served as the closing agent and through these Agents, ATIF sold title insurance products to WaMu and collected premiums. ATIF also issued CPLs to WaMu for each of the fourteen Transactions, which include the same material terms and state in pertinent part:

> When title insurance of Attorneys' Title Insurance Fund, Inc. is specified for your protection in connection with closings of real estate transactions in which you are to be . . . a lender secured by a mortgage (including any other security instrument) of an interest in land, the Attorneys' Title Insurance Fund, Inc., subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by said Issuing Agent or Approved Attorney when such loss arises out of:
>
> 1.      Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any document, specifically required by you, but not to the extent that said instructions require a

4

determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

2.     Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

Copies of the fourteen CPLs issued by ATIF to WaMu for the Transactions in question are attached as Exhibits A-N.

## THE FRAUDULENT AND DISHONEST
## CONDUCT OF ATIF'S AGENTS

15.     ATIF's Agents misappropriated millions of dollars of WaMu's funds in the fourteen Transactions described below, using falsified loan, settlement and accounting documents. ATIF's Agents concealed this fraud from WaMu, and disbursed millions of dollars that resulted in at least $9.6 million in actual losses to WaMu for which reimbursement is required under the provisions of the CPLs. The fraud, dishonesty, and failure to comply with WaMu's closing instructions of ATIF's Agents are set forth below.

### A.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent Michael I. Rose, P.A., and its Approved Attorney, Michael I. Rose

16.     Michael I. Rose, P.A. was one of ATIF's issuing agents and its president, Michael I. Rose (collectively, "Rose"), was one of ATIF's approved attorneys. In 2005, Rose defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.

17.     In April 2005, a borrower (the "Melaeuca Lane Borrower") entered into a contract to purchase residential property at 625 Melaeuca Lane, Miami, Florida, for $1,750,000 (the "Melaeuca Property Transaction"). The Melaeuca Lane Borrower applied for and received a first mortgage loan in the amount of $1,312,500 from WaMu to fund the purchase of this

property. WaMu approved the loan to the Melaeuca Lane Borrower to purchase the property subject to certain enumerated terms and conditions.

18.     ATIF's issuing agent and approved attorney, Rose, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from Rose's fraudulent or dishonest actions with the closing of the Melaeuca Property Transaction. A copy of the CPL is included in Exhibit A.

19.     WaMu provided Rose with instructions specifying requirements for closing the transaction. As closing agent, Rose agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender." In June 2005, WaMu transferred the loan proceeds to Rose's account for the closing of the Melaeuca Property Transaction to disburse in the manner approved by WaMu.

20.     Rose closed the transaction on June 17, 2005 and disbursed WaMu's funds. The HUD-1 Settlement Statement ("Settlement Statement") prepared and executed by Rose and submitted to WaMu certified that the Melaeuca Lane Borrower had paid a $100,000 deposit and brought an additional $349,973.39 to close Melaeuca Property Transaction. Rose further certified to WaMu that the Settlement Statement prepared by Rose was a true and accurate account of the transaction, and that Rose had caused or would cause the funds to be disbursed in

accordance with the Settlement Statement.

21.     Unbeknownst to WaMu, Rose in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Rose prepared and submitted to WaMu was false since: (a) the Melaeuca Lane Borrower provided only $162,423.39 at the closing of the Melaeuca Property Transaction; and (b) it failed to disclose that the Melaeuca Lane Borrower funded a substantial portion of her down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $187,500.  Rose also failed to disclose to WaMu title commitments reflecting the National City Bank loan.  Rose concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

22.     The loan went into default in September 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Melaeuca Property Transaction is not less than $500,000.

### B.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent S&W Group, LLC, and its Approved Attorney, Erik Wesoloski

23.     S&W Group, LLC ("S&W") was one of ATIF's issuing agents.  In June 2005, S&W defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.    S&W's managing members were Jose Sigui ("Sigui") and Erik Wesoloski ("Wesoloski").  Wesoloski was also the owner of S&W and an approved attorney of ATIF.

24.     In April 2005, Sigui entered into a contract to purchase a residential property at 1505 North Fort Lauderdale Beach Blvd., Fort Lauderdale, Florida from Juan Paredes ("Paredes") for $1,750,000 (the "1505 North Fort Lauderdale Property Transaction").  Sigui applied for and received a first mortgage loan in the amount of $1,400,000.  WaMu approved the

7

loan to Sigui to purchase the property subject to certain enumerated terms and conditions, including the sale of property allegedly owned by Sigui, located at 1401 Coral Way, Unit 1504, Miami, Florida (the "1401 Coral Way Property").

25.     Also in April 2005, Wesoloski entered into a contract to purchase a residential property at 1501 North Fort Lauderdale Beach Blvd., Fort Lauderdale, Florida from Paredes for $1,950,000 (the "1501 North Fort Lauderdale Property Transaction"). Wesoloski applied for and received a first mortgage loan in the amount of $1,560,000. WaMu approved the loan to Wesoloski to purchase the property subject to certain enumerated terms and conditions, including the sale of property allegedly owned by Wesoloski, located 2080 SW 60th Court, Miami, Florida (the "2080 SW 60th Court Property").

26.     ATIF's issuing agent, S&W, issued ATIF's title insurance and acted as the closing agent on both transactions. ATIF issued CPLs protecting WaMu from S&W's fraudulent or dishonest actions in connection with the closings of the 1501 and 1505 North Fort Lauderdale Property Transactions. Copies of the CPLs are included in Exhibits B and C.

27.     WaMu provided S&W with instructions specifying requirements for closing the transactions. As closing agent, S&W agreed that it would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions. As to the 1505 North Fort Lauderdale Property Transaction, one of the conditions stated: "At closing obtain copy of HUD-1 showing payoff of existing mortgages totaling $267,000 with GMAC & Wells Fargo, on property located at 1401 Coral Way, netting at least $197,000." As to the 1501 North Fort Lauderdale Property Transaction, one of the additional conditions stated: "Copy of HUD-1 settlement statement on

property located at 2080 SW 60 Court,[] Miami, fl., netting no less than $247[,]000 . . . ."

28.    In May 2005, S&W transmitted to WaMu title commitments that showed that the 1501 and 1505 North Fort Lauderdale Properties were titled in the name of Paredes as of that date, and that there were no other impediments that would prevent Sigui and Wesoloski from receiving good title at the closing of each respective transaction.    In June 2005, WaMu transferred the loan proceeds to S&W's account for the 1501 and 1505 North Fort Lauderdale Property Transactions to disburse in the manner approved by WaMu.

29.    S&W closed the 1501 and 1505 North Fort Lauderdale Property Transactions on June 20, 2005 and disbursed WaMu's funds.    S&W further certified to WaMu that the Settlement Statement prepared by S&W was a true and accurate account of the transaction, and that S&W had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

30.    Unbeknownst to WaMu, S&W was working in concert with Sigui, Wesoloski, and others to misappropriate WaMu's funds by falsely representing the terms of the transactions. Paredes was not the record title owner of the 1501 and 1505 North Fort Lauderdale Property Transactions at the time Sigui and Wesoloski entered into the contracts to purchase these properties or at the time S&W provided the title commitments to WaMu in May 2005.  Rather, Old World Holdings, LLC and Old World Holdings II, LLC (together, "Old World") were the true record title owners of the 1501 and 1505 North Fort Lauderdale Properties, respectively, until the transfers of these properties took place on June 16, 2005.  The deeds transferring title from Old World to Paredes were not recorded until June 23, 2005, three days after the closing of the 1501 and 1505 North Fort Lauderdale Property Transactions.  Thus, the title commitments

provided to WaMu the month prior to the closing misrepresented that Paredes owned the 1501 and 1505 North Fort Lauderdale Properties at that time.

31.     In addition, the Settlement Statements provided by S&W to allegedly document the sales of the 1401 Coral Way and 2080 SW 60th Court Properties were fictitious as they described sales that never occurred.  As a result, S&W closed the 1501 and 1505 North Fort Lauderdale Property Transactions and disbursed WaMu's loan proceeds without complying with WaMu's loan conditions in violation of the express closing instructions.  In doing so, S&W misrepresented to WaMu the nature of the transactions and misappropriated WaMu's funds by disbursing them in a manner not agreed to by WaMu.  The actions taken by S&W in the 1501 and 1505 North Fort Lauderdale Property Transactions demonstrate that it acted fraudulently and dishonestly in handling WaMu's funds and documents and failed to comply with WaMu's closing instructions.

32.     The loans went into default in April 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent 1505 North Fort Lauderdale Property Transaction is not less than $845,000.  WaMu's actual loss on the fraudulent 1501 North Fort Lauderdale Property Transaction is not less than $1,045,000.  WaMu's total aggregated losses on these loans are not less than $1.89 million.

### C.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent and Approved Attorney, Rafael Ubieta

33.     In 2006, attorney Rafael Ubieta, in his capacity as principal of The Law Office of Rafael Ubieta and Bayside Title Services, Inc. (collectively, "Ubieta"), defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.  In his roles as closing agent, and approved attorney and issuing agent for ATIF, Ubieta misrepresented information on

10

the Settlement Statement submitted to WaMu in that he failed to disclose the existence of a loan from another bank which was documented and recorded in second position behind the loan procured from WaMu.

34.    In September 2006, a borrower (the "Breakwater Court Borrower") entered into a contract to purchase residential property at 1106 Breakwater Court, Marco Island, Florida, for $1,245,000 (the "Breakwater Property Transaction"). The Breakwater Court Borrower applied for and received a first mortgage loan in the amount of $933,500 from WaMu to fund the purchase of this property. WaMu approved the loan to the Breakwater Court Borrower to purchase the property subject to certain enumerated terms and conditions.

35.    ATIF's issuing agent and approved attorney, Ubieta, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from Ubieta's fraudulent or dishonest actions in connection with the closing of the Breakwater Property Transaction. A copy of the CPL is included in Exhibit D.

36.    WaMu provided Ubieta with instructions specifying requirements for closing the transaction. As closing agent, Ubieta agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing [was] allowed on this transaction." In October 2006,

11

WaMu transferred the loan proceeds to Ubieta's account for the closing of the Breakwater Property Transaction to disburse in the manner approved by WaMu.

37.     Ubieta closed the transaction on October 19, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Ubieta and submitted to WaMu certified that the Breakwater Court Borrower had brought $343,197.29 in funds to the closing of the Breakwater Property Transaction.     Ubieta further certified to WaMu that the Settlement Statement prepared by Ubieta was a true and accurate account of the transaction, and that Ubieta had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

38.     Unbeknownst to WaMu, Ubieta in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Ubieta prepared and submitted to WaMu was false since: (a) the Breakwater Court Borrower provided only $157,455.74 at the closing of the Breakwater Property Transaction; and (b) it failed to disclose that the Breakwater Court Borrower funded a substantial portion of his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $186,900. Ubieta concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.  Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Ubieta prepared and provided to WaMu a falsified Title Commitment, which failed to disclose the existence of the National City Bank loan.

39.     The loan went into default in March 2008 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Breakwater Property Transaction is not less than

12

$680,000.

**D.    Fraudulent and Dishonest Conduct of ATIF's Issuing Agent, Ryan T. Dosen, PL, and its Approved Attorney, Ryan T. Dosen**

40.    Ryan T. Dosen, P.L. was one of ATIF's issuing agents and its principal, Ryan T. Dosen (collectively, "Dosen"), was one of ATIF's approved attorneys.  Beginning in 2006, Dosen defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.  Dosen, in his roles as closing agent, and issuing agent and approved attorney for ATIF, misrepresented information on the Settlement Statements submitted to WaMu by failing to disclose the existence of second mortgages or private loans which were used to fund the down payments of the subject properties.  Dosen also made improper disbursements without advising WaMu that the loan proceeds were being used in a manner inconsistent from WaMu's closing instructions and materially different from the Settlement Statements recording the receipts and disbursements of the transaction funds.  Dosen acted fraudulently and dishonestly in handling WaMu's funds in the five transactions detailed below.

**(1)    3022 Indiana Street, Miami, Florida**

41.    In October 2006, a borrower (the "Indiana Street Borrower") entered into a contract to purchase residential property at 3022 Indiana Street, Miami, Florida, for $950,000 (the "Indiana Street Property Transaction").  The Indiana Street Borrower applied for and received a first mortgage loan in the amount of $760,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Indiana Street Borrower to purchase the property subject to certain enumerated terms and conditions.

42.    ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Dosen's fraudulent or

dishonest actions in connection with the closing of the Indiana Street Property Transaction. A copy of the CPL is included in Exhibit E.

43. WaMu provided Dosen with instructions specifying requirements for closing the transaction. As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed." In December 2006, WaMu transferred the loan proceeds to Dosen's account for the closing of the Indiana Street Property Transaction to disburse in the manner approved by WaMu.

44. Dosen closed the transaction on December 20, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the Indiana Street Borrower had brought $183,939.52 in funds to the closing of the Indiana Street Property Transaction, and that there was no other financing provided to the Indiana Street Borrower that reduced the amount of his down payment obligation at the closing of the Indiana Street Property Transaction. Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

45.     Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the Indiana Street Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by Aegis Funding in the amount of $190,000. Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement. Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which also failed to disclose the existence of the second mortgage by Aegis Funding.

46.     The loan went into default in October 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent Indiana Street Property Transaction is not less than $415,000.

(2)     **400 Alton Road, #411, Miami Beach, Florida**

47.     In November 2006, a borrower (the "Alton Road Borrower") entered into a contract to purchase residential property at 400 Alton Road, #411, Miami Beach, Florida, for $1,400,000 (the "Alton Property Transaction"). The Alton Road Borrower applied for and received a first mortgage loan in the amount of $1,120,000 from WaMu to fund the purchase of this property. WaMu approved the loan to the Alton Road Borrower to purchase the property subject to certain enumerated terms and conditions.

48.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance

15

and acted as closing agent. ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the Alton Property Transaction. A copy of the CPL is included in Exhibit F.

49.     WaMu provided Dosen with instructions specifying requirements for closing the transaction. As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed." In December 2006, WaMu transferred the loan proceeds to Dosen's account for the closing of the Alton Property Transaction to disburse in the manner approved by WaMu.

50.     Dosen closed the transaction on December 22, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the Alton Road Borrower had brought $227,416.92 in funds to the closing of the Alton Property Transaction, and that there was no other financing provided to the Alton Road Borrower that reduced the amount of his down payment obligation at the closing of the Alton Property Transaction. Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

16

51.     Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the Alton Road Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $250,000.  Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.  Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which also failed to disclose the existence of the second mortgage by National City Bank.

52.     The loan went into default in March 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Alton Property Transaction is not less than $465,000.

     **(3)     1200 West Avenue, #1102, Miami Beach, Florida**

53.     In December 2006, a borrower (the "West Avenue Borrower") entered into a contract to purchase residential property at 1200 West Avenue, #1102, Miami Beach, Florida, for $299,000 (the "West Avenue Property Transaction").  The West Avenue Borrower applied for and received a first mortgage loan in the amount of $239,200 from WaMu to fund the purchase of this property.  WaMu approved the loan to the West Avenue Borrower to purchase the property subject to certain enumerated terms and conditions.

54.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance

and acted as closing agent. ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the West Avenue Property Transaction. A copy of the CPL is included in Exhibit G.

      55.    WaMu provided Dosen with instructions specifying requirements for closing the transaction. As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed." In February 2007, WaMu transferred the loan proceeds to Dosen's account for the closing of the West Avenue Property Transaction to disburse in the manner approved by WaMu.

      56.    Dosen closed the transaction on February 5, 2007 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the West Avenue Borrower had brought $49,335.36 in funds to the closing of the West Avenue Property Transaction, that $5,049.62 had been provided as a seller contribution, and that there was no other financing provided to the West Avenue Borrower that reduced the amount of her down payment obligation at the closing of the West Avenue Property Transaction. Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed

in accordance with the Settlement Statement.

57.    Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. The Settlement Statement that Dosen prepared and submitted to WaMu was false, since the only funds brought to close the West Avenue Property Transaction, approximately $49,360.36, were actually paid by a mortgage broker, who took a junior mortgage lien against the subject property. Accordingly, the West Avenue Borrower made no actual down payment and received prohibited secondary financing. Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement. Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which also failed to disclose the source of the down payment funds.

58.    The loan went into default in November 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent West Avenue Property Transaction is not less than $135,000.

(4)    **3029 NE 188th Street, #422, Miami, Florida**

59.    In March 2007, a borrower (the "188th Street Borrower") entered into a contract to purchase residential property at 3029 NE 188th Street, #422, Miami, Florida, for $627,700 (the "188th Street Property Transaction"). The 188th Street Borrower applied for and received a first mortgage loan in the amount of $502,160 from WaMu to fund the purchase of this property. WaMu approved the loan to the 188th Street Borrower to purchase the property subject to certain enumerated terms and conditions.

19

60.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the 188th Street Property Transaction.  A copy of the CPL is included in Exhibit H.

61.     WaMu provided Dosen with instructions specifying requirements for closing the transaction.  As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed."  In June 2007, WaMu transferred the loan proceeds to Dosen's account for the closing of the 188th Street Property Transaction to disburse in the manner approved by WaMu.

62.     Dosen closed the transaction on June 5, 2007 and disbursed WaMu's funds.  The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the 188th Street Borrower had paid a $5,000 deposit prior to the closing of the 188th Street Property Transaction, the 188th Street Borrower had brought $146,528.88 in funds to the closing of the 188th Street Property Transaction, and that there was no other financing provided to the 188th Street Borrower that reduced the amount of his down payment obligation at the closing of the 188th Street Property Transaction.   Dosen further certified to WaMu that the Settlement

20

Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

63.     Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the 188th Street Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by Countrywide in the amount of $200,000. The Settlement Statement was also false in that the seller, not the 188th Street Borrower, paid the $5,000 initial deposit into escrow. Dosen also improperly disbursed $44,243.48 of WaMu's funds directly to the 188th Street Borrower. Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement. Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which failed to disclose the existence of the second mortgage by Countrywide.

64.     The loan went into default in January 2008 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent 188th Street Property Transaction is not less than $175,000.

**(5)    11145 NW 78th Lane, Miami, Florida**

65.     In April 2007, a borrower (the "78th Lane Borrower") entered into a contract to purchase residential property at 11145 NW 78th Lane, Miami, Florida, for $1,250,000 (the "78th

Lane Property Transaction"). The 78[th] Lane Borrower applied for and received a first mortgage loan in the amount of $1,000,000 from WaMu to fund the purchase of this property. WaMu approved the loan to the 78[th] Lane Borrower to purchase the property subject to certain enumerated terms and conditions.

66.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the 78th Lane Property Transaction. A copy of the CPL is included in Exhibit I.

67.     WaMu provided Dosen with instructions specifying requirements for closing the transaction. As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed." In June 2007, WaMu transferred the loan proceeds to Dosen's account for the closing of the 78th Lane Property Transaction to disburse in the manner approved by WaMu.

68.     Dosen closed the transaction on June 29, 2007 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the 78th Lane Borrower had brought $244,177.72 in funds to the closing of the 78th Lane Property

Transaction, and that there was no financing or credits provided to the 78th Lane Borrower that reduced the amount of his down payment obligation at the closing of the 78th Lane Property Transaction. Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

69.    Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the 78th Lane Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $124,900. The Settlement Statement was also false since it failed to disclose that the seller provided $151,546.87 in credits to the 78th Lane Borrower in lieu of the 78th Lane Borrower providing the remainder of the down payment. Dosen also improperly disbursed WaMu's funds over a period of months after the closing of the 78th Lane Property Transaction to parties that were not disclosed on the Settlement Statement as receiving disbursements. Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

70.    The loan went into default in March 2008 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent 78th Lane Property Transaction is not less than $565,000.

**E.    Fraudulent and Dishonest Conduct of ATIF's Approved Attorney and Issuing Agent, Aubrey G. Rudd**

71.    Aubrey G. Rudd ("Rudd") was one of ATIF's issuing agents and approved

23

attorneys. Beginning in 2006, Rudd defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida. Rudd, acting in his roles as closing agent, and approved attorney and issuing agent for ATIF, misrepresented information on the Settlement Statements submitted to WaMu by failing to disclose the existence of a loan from another bank which was documented and recorded in second position behind the loan procured from WaMu.

72.     Rudd also improperly disbursed proceeds to parties not disclosed on the Settlement Agreements, without advising WaMu that the loan proceeds were being used in a manner inconsistent from WaMu's closing instructions and materially different from the Settlement Statements recording the receipts and disbursements of the transaction funds. Rudd acted fraudulently and dishonestly in handling WaMu's funds in the three transactions detailed below.

**(1)     213 Water Way, Miami Beach, Florida**

73.     On or about October 2006, a borrower (the "Water Way Borrower") entered into a contract to purchase residential property at 213 Water Way, Miami Beach, Florida, for $3,300,000 (the "Water Way Property Transaction"). The Water Way Borrower applied for and received a first mortgage loan in the amount of $2,640,000 from WaMu to fund the purchase of this property. WaMu approved the loan to the Water Way Borrower to purchase the property subject to certain enumerated terms and conditions.

74.     ATIF's issuing agent and approved attorney, Rudd, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from Rudd's fraudulent or dishonest actions in connection with the closing of the Water Way Property Transaction. A copy of the CPL is included in Exhibit J.

75.     WaMu provided Rudd with instructions specifying requirements for closing the transaction. As closing agent, Rudd agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed." In November 2006, WaMu transferred the loan proceeds to Rudd's account for the closing of the Water Way Property Transaction to disburse in the manner approved by WaMu.

76.     Rudd closed the transaction on November 29, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Rudd and submitted to WaMu certified that the Water Way Borrower had brought $630,136.32 in funds to the closing of the Water Way Property Transaction, $1,508,333.68 was disbursed to the seller, and that there was no other financing provided to the Water Way Borrower that reduced the amount of his down payment obligation at the closing of the Water Way Property Transaction. Rudd further certified to WaMu that the Settlement Statement prepared by Rudd was a true and accurate account of the transaction, and that Rudd had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

77.     Unbeknownst to WaMu, Rudd in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. The Settlement Statement that Rudd prepared and

submitted to WaMu was false since: (a) it failed to disclose that the Water Way Borrower funded a substantial portion of his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $328,000; and (b) no sale proceeds were disbursed to the seller. Instead, Rudd improperly disbursed $1,241,481 of WaMu's funds to entities not disclosed on the Settlement Statement. Rudd concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement. Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Rudd prepared and provided to WaMu a falsified Title Commitment, which failed to disclose the existence of the National City Bank loan.

78.     The loan went into default in September 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent Water Way Property Transaction is not less than $1,150,000.

**(2)     3615 Battersea Road, Miami, Florida**

79.     In May 2007, a borrower (the "Battersea Road Borrower") entered into a contract to purchase residential property at 3615 Battersea Road, Miami, Florida, for $2,800,000 (the "Battersea Property Transaction"). The Battersea Road Borrower applied for and received a first mortgage loan in the amount of $2,240,000 from WaMu to fund the purchase of this property. WaMu approved the loan to the Battersea Road Borrower to purchase the property subject to certain enumerated terms and conditions.

80.     ATIF's issuing agent and approved attorney, Rudd, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from Rudd's fraudulent or dishonest actions in connection with the closing of the Battersea Property Transaction. A copy

of the CPL is included in Exhibit K.

81.    WaMu provided Rudd with instructions specifying requirements for closing the transaction.  As closing agent, Rudd agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender." In July 2007, WaMu transferred the loan proceeds to Rudd's account for the closing of the Battersea Property Transaction to disburse in the manner approved by WaMu.

82.    Rudd closed the transaction on July 12, 2007 and disbursed WaMu's funds. The Settlement Statement prepared by Rudd and submitted to WaMu certified that the Battersea Road Borrower had brought $541,103.70 in funds to the closing of the Battersea Property Transaction, $1,213,355.70 was disbursed to the seller, and that there was no other financing provided to the Battersea Road Borrower that reduced the amount of his down payment obligation at the closing of the Battersea Property Transaction. Rudd further certified to WaMu that the Settlement Statement prepared by Rudd was a true and accurate account of the transaction, and that Rudd had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

83.    Unbeknownst to WaMu, Rudd in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Rudd prepared and

submitted to WaMu was false since: (a) the Battersea Road Borrower provided no funds to close the Battersea Property Transaction; and (b) only $643,154.66 was disbursed to the seller, rather than the $1,213,355.70 represented in the Settlement Statement. Rudd concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

84. The loan went into default in November 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent Battersea Property Transaction is not less than $625,000.

### (3) 211 Ari Way, Miami Beach, Florida

85. In April 2007, a borrower (the "Ari Way Borrower") entered into a contract to purchase residential property at 211 Ari Way, Miami Beach, Florida, for $3,500,000 (the "Ari Way Property Transaction"). The Ari Way Borrower applied for and received a first mortgage loan in the amount of $2,625,000 from WaMu to fund the purchase of this property. WaMu approved the loan to the Ari Way Borrower to purchase the property subject to certain enumerated terms and conditions, including the Ari Way Borrower's promise to obtain a second position purchase money loan for $350,000 from an outside lender, which the Ari Way Borrower thereafter obtained through National Home Equity (the "National Loan").

86. ATIF's issuing agent and approved attorney, Rudd, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from Rudd's fraudulent or dishonest actions in connection with the closing of the Ari Way Property Transaction. A copy of the CPL is included in Exhibit L.

87. WaMu provided Rudd with instructions specifying requirements for closing the transaction. As closing agent, Rudd agreed that he would comply with WaMu's instructions.

Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender." In July 2007, WaMu transferred the loan proceeds to Rudd's account for the closing of the Ari Way Property Transaction to disburse in the manner approved by WaMu.

88.    Rudd closed the transaction on July 31, 2007 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Rudd and submitted to WaMu certified that the Ari Way Borrower had brought $914,082.21 in funds to the closing of the Ari Way Property Transaction (which was comprised of $572,630 in cash from the Ari Way Borrower and the proceeds from the National Loan), $1,185,462.20 was disbursed to the seller, and that, besides the WaMu loan and the National Loan, there was no other financing provided to the Ari Way Borrower that reduced the amount of her down payment obligation at the closing of the Ari Way Property Transaction. Rudd further certified to WaMu that the Settlement Statement prepared by Rudd was a true and accurate account of the transaction, and that Rudd had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

89.    Unbeknownst to WaMu, Rudd in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. The Settlement Statement that Rudd prepared and submitted to WaMu was false since: (a) the Ari Way Borrower provided no funds to close the Ari Way Property Transaction, leaving the transaction under-funded in the amount of

$572,630.20; and (b) the seller received no proceeds from the Ari Way Property Transaction. Instead, Rudd improperly disbursed $612,832 of WaMu's funds to parties that were not disclosed on the Settlement Statement as receiving disbursements. Rudd concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

90.     The loan went into default in September 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent Ari Way Property Transaction is not less than $910,000.

### F.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent, Anett López, P.A., and its Approved Attorney, Anett López

91.     Anett López, P.A. was one of ATIF's issuing agents and its principal, Anett López (collectively, "López"), was one of ATIF's approved attorneys. In 2007, López defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.

92.     In May 2007, a borrower (the "Bass Avenue Borrower") entered into a contract to purchase residential property at 76 Bass Avenue, Key Largo, Florida, for $2,200,000 (the "Bass Avenue Property Transaction"). The Bass Avenue Borrower applied for and received a first mortgage loan in the amount of $1,760,000 from WaMu to fund the purchase of this property. WaMu approved the loan to the Bass Avenue Borrower to purchase the property subject to certain enumerated terms and conditions.

93.     ATIF's issuing agent and approved attorney, López, issued ATIF's title insurance and acted as closing agent. ATIF issued a CPL protecting WaMu from López's fraudulent or dishonest actions in connection with the closing of the Bass Avenue Property Transaction. A copy of the CPL is included in Exhibit M.

94.     WaMu provided López with instructions specifying requirements for closing the

transaction.  As closing agent, López agreed that she would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "no subordinate financing" was allowed on this transaction.  In June 2007, WaMu transferred the loan proceeds to López's account for the closing of the Bass Avenue Property Transaction to disburse in the manner approved by WaMu.

95.     López closed the transaction on June 18, 2007 and disbursed WaMu's funds.  The Settlement Statement prepared and executed by López and submitted to WaMu certified that the Bass Avenue Borrower had brought $505,355.98 in funds to the closing of the Bass Avenue Property Transaction, $1,664,094.37 was to be disbursed to the seller, and that there was no other financing or credits provided to the Bass Avenue Borrower that reduced the amount of her down payment obligation at the closing of the Bass Avenue Property Transaction.  López further certified to WaMu that the Settlement Statement prepared by López was a true and accurate account of the transaction, and that López had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

96.     Unbeknownst to WaMu, López in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that López prepared and submitted to WaMu was false since: (a) the Bass Avenue Borrower provided no funds to close

the Bass Avenue Property Transaction; (b) it failed to disclose that the seller provided credits to the Bass Avenue Borrower, in the form of a $131,811.98 "Closing Cost Credit" and a $350,000 "Boat Dock Repair" credit, in lieu of the remainder of the down payment; (c) an undisclosed disbursement in the amount of $298,262.92 was made to Regions Bank; and (d) the seller was paid only $883,869.47. López concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

97.     The loan went into default in December 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent Bass Avenue Property Transaction is not less than $1,300,000.

### G.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent, Kramer & Golden, P.A., and its Approved Attorney, Richard Golden

98.     Kramer & Golden, P.A. was one of ATIF's issuing agents, and its principal attorney, Richard Golden (collectively, "K&G"), was one of ATIF's approved attorneys. In 2007, K&G defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.

99.     In September 2007, a borrower (the "Alamanda Drive Borrower") entered into a contract to purchase residential property at 2190 Alamanda Drive, North Miami, Florida, for $1,580,000 (the "Alamanda Property Transaction"). The Alamanda Drive Borrower applied for and received a first mortgage loan in the amount of $1,264,000 and a second mortgage loan in the amount of $157,842 from WaMu to fund the purchase of this property. WaMu approved the loan to the Alamanda Drive Borrower to purchase the property subject to certain enumerated terms and conditions.

100.    ATIF's issuing agent and approved attorney, K&G, issued ATIF's title insurance

and acted as closing agent. ATIF issued a CPL protecting WaMu from K&G's fraudulent or dishonest actions in connection with the closing of the Alamanda Property Transaction. A copy of the CPL is included in Exhibit N.

101. WaMu provided K&G with instructions specifying requirements for closing the transaction. As closing agent, K&G agreed that it would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender." In October 2007, WaMu transferred the loan proceeds to K&G's account for the closing of the Alamanda Property Transaction to disburse in the manner approved by WaMu.

102. K&G closed the transaction on October 19, 2007 and disbursed WaMu's funds. The Settlement Statement prepared and executed by K&G and submitted to WaMu certified that: (a) the Alamanda Drive Borrower had brought $86,169.47 in funds to the closing of the Alamanda Property Transaction; (b) $317,470.94 was to be disbursed to the sellers; (c) $211,000 would be paid to Commercial Residential & Design, Inc. for remodeling; and (d) there was no other financing or credits provided to the Alamanda Drive Borrower that reduced the amount of the down payment obligation at the closing of the Alamanda Property Transaction. K&G further certified to WaMu that the Settlement Statement prepared by K&G was a true and accurate account of the transaction, and that K&G had caused or would cause the funds to be disbursed in

accordance with the Settlement Statement.

103.   Unbeknownst to WaMu, K&G in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  On information and belief, the Settlement Statement that K&G prepared and submitted to WaMu was false since: (a) the Alamanda Drive Borrower provided no funds to close the Alamanda Property Transaction; (b) it failed to disclose that, in lieu of the remainder of the down payment, the seller provided credits to the Alamanda Drive Borrower, in the form of a $47,400 credit towards the Alamanda Drive Borrower's closing costs or discount points, a $50,000 credit in the form of a one year "purchase money mortgage" provided by the sellers, and a $216,000 credit for "remodeling" the property; (c) the sellers were actually paid $252,470.94; and (d) Commercial Residential & Design, Inc. was only paid $124,810.53, rather than the $211,000 reflected in the Settlement Statement.  K&G concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

104.   The loans went into default in March 2008 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Alamanda Property Transaction is not less than $730,000.

### WAMU HAS SUFFERED EXTENSIVE LOSSES BECAUSE OF ATIF'S FAILURE TO HONOR ITS CPL OBLIGATIONS

105.   The fraud, dishonesty, and failure to comply with WaMu's closing instructions of ATIF's approved attorneys and issuing agents have caused extensive losses to WaMu.  WaMu would not have made the loans or dispersed any of the funds at the closings described above if it had known of the fraud, dishonesty, and failure to comply with WaMu's closing instructions by ATIF's Agents.

34

106.    In its capacity as receiver for WaMu, the FDIC-R provided ATIF with timely notice of its claims under the CPLs.  The FDIC-R's CPL claims sought reimbursement for WaMu's actual losses arising out of the fraud and dishonesty of ATIF's Agents in connection with each of the Transactions.  To date, ATIF has failed to reimburse the FDIC-R for any of the actual losses suffered as required under its CPLs.

**COUNT ONE**
**(Breach of Contract)**

107.    The FDIC-R hereby incorporates Paragraphs 1 through 106 of its Complaint as Paragraph 107 of this Count One as though fully set forth herein.

108.    The CPLs are valid and binding contracts between the FDIC-R and ATIF.

109.    The CPLs require ATIF to reimburse the FDIC-R for losses that result from the fraud, dishonesty, and failure to comply with WaMu's closing instructions of ATIF's Agents in connection with the closings described above.

110.    ATIF's Agents engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to each of these closings, and the FDIC-R has experienced significant losses as a result.

111.    ATIF has breached the CPLs by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by ATIF's Agents.

112.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the CPLs.

113.    The FDIC-R and WaMu have performed all obligations required of them under the CPLs, and all conditions in the CPLs for the reimbursement of losses by ATIF have been

met.

114.    As a result of ATIF's repeated breaches of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $9.6 million, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the CPLs and prosecuting this action.

**COUNT TWO**
**(Declaratory Relief)**

115.    The FDIC-R hereby incorporates Paragraphs 1 through 106 of its Complaint as Paragraph 115 of this Count Two as though fully set forth herein.

116.    The FDIC-R contends that, pursuant to the terms of the CPLs, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by ATIF's Agents in connection with closing the Transactions.

117.    The FDIC-R further contends that ATIF's Agents in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

118.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by ATIF's Agents; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the written CPL claims relating to the Transactions in a timely manner.

119.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the CPLs.  There is a current and actual

36

controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the CPLs. The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the CPLs.

120.    The FDIC-R and WaMu have performed all obligations required of them under the CPLs.

121.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

122.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

123.    The FDIC-R believes it is entitled to compensation under the provisions of the CPLs requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by ATIF's Agents in connection with closing the Transactions. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the CPLs and the extent to which the CPLs provide coverage for the Transactions described herein.

124.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

125.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the CPLs by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by ATIF's Agents; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from

ATIF under the CPLs for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by ATIF's Agents in connection with the Transactions described herein.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff FDIC-R demands the following relief:

A.      an award of damages for all amounts recoverable resulting from Defendant ATIF's breaches of the CPLs;

B.      an award of pre-judgment interest on the damages resulting from Defendant ATIF's breaches of the CPLs, including but not limited to: (1) interest incurred from the date of the closings of the fourteen Transactions to the date of the filing of this Complaint (the "Filing Date"); and (2) interest incurred from the Filing Date to the date that judgment is entered in this case;

C.      the entry of a judgment declaring that: (1) ATIF has breached the CPLs by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by ATIF's Agents; and (2) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the CPLs for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by ATIF's Agents in connection with the Transactions described herein; and

D.      all other relief that the Court determines is both reasonable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff FDIC-R hereby demands a trial by jury on all issues so triable.

38

Dated:  October 2, 2012

By___/s/ Steven Katzman, Esq._____

Of counsel:
Aaron M. Forester
FDIC Legal Division
3501 Fairfax Drive. VS-B-7066
Arlington, VA 22226
Tel.: 703-516-5056
Email: aforester@FDIC.gov

Steven Jay Katzman (Trial Counsel)
BIENERT, MILLER & KATZMAN PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Tel:  949-369-3700
Fax:  949-369-3701
Email: skatzman@bmkattorneys.com


By_____/s/ Carla Barrow, Esq._____
Carla M. Barrow
Florida Bar No.: 797227
LYDECKER DIAZ
1221 Brickell Avenue, 19th Floor
Miami, FL 33131
Tel.: (305) 416-3180
Email: cmb@lydeckerdiaz.com

Counsel for the Federal Deposit Insurance
Corporation as Receiver for Washington
Mutual Bank, FSB

39

Dated:  October 2, 2012

Of counsel:
Aaron M. Forester
FDIC Legal Division
3501 Fairfax Drive. VS-B-7066
Arlington, VA 22226
Tel.: 703-516-5056
Email: aforester@FDIC.gov

By   /s/ Steven Katzman, Esq.
Steven Jay Katzman (Trial Counsel)
BIENERT, MILLER & KATZMAN PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Tel:  949-369-3700
Fax:  949-369-3701
Email: skatzman@bmkattorneys.com


By        /s/ Carla Barrow, Esq.
Carla M. Barrow
Florida Bar No.: 797227
LYDECKER DIAZ
1221 Brickell Avenue, 19th Floor
Miami, FL 33131
Tel.: (305) 416-3180
Email: cmb@lydeckerdiaz.com

Counsel for the Federal Deposit Insurance
Corporation as Receiver for Washington
Mutual Bank, FSB