**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 12-23599-CIV-SEITZ/SIMONTON

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK, <br><br>     Plaintiff, <br><br> v. <br><br> ATTORNEYS' TITLE INSURANCE FUND, INC. <br><br>     Defendant. | Jury Trial Demanded |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

The Federal Deposit Insurance Corporation ("FDIC"), as Receiver for Washington Mutual Bank, FSB ("FDIC-R" or "Plaintiff"), through its undersigned counsel, hereby submits this First Amended Complaint (the "FAC") against Defendant Attorneys' Title Insurance Fund, Inc. ("ATIF" or "Defendant").

**INTRODUCTION**

1.    The FDIC-R brings this action to enforce commitments ATIF made in Closing Protection Letters ("CPLs") it issued to Washington Mutual Bank ("WaMu") in connection with fourteen residential real estate transactions (the "Transactions") financed by WaMu.

2.    In each Transaction, the closing agents were approved and authorized issuing agents or approved attorneys of ATIF ("ATIF's Agents").  ATIF's Agents were authorized to issue its title insurance policies.

3.     In exchange for compensation, and to encourage WaMu to use and trust ATIF's Agents with handling its funds and documents at closings, ATIF issued CPLs to WaMu.  In the CPLs, ATIF promised to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by ATIF's Agents in connection with closing the Transactions.

4.     ATIF's Agents in fact fraudulently and dishonestly handled documents and stole WaMu's funds.  Specifically, ATIF's Agents misappropriated WaMu's funds, and disbursed those funds in a manner contrary to WaMu's instructions.

5.     Even though ATIF's Agents engaged in the precise fraud, dishonesty, and failure to comply with WaMu's closing instructions as covered by the CPLs, and despite the FDIC-R's demands that ATIF honor its promises in the CPLs, ATIF has refused to do so, resulting in millions of dollars of past and continuing losses to the FDIC-R.

## PARTIES, JURISDICTION & VENUE

6.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq*.  The FDIC is headquartered in Washington, D.C.  On September 25, 2008, the Office of Thrift Supervision ("OTS") closed WaMu and duly appointed FDIC as its receiver.  Plaintiff FDIC-R brings this case in its capacity as WaMu's Receiver under authority granted it in 12 U.S.C. § 1821.  As receiver, FDIC-R acquired all rights, titles, powers and privileges of WaMu.  *See* 12 U.S.C.  § 1821(d)(2).  Accordingly, the FDIC-R has standing to prosecute this action as Receiver of WaMu.

7.     Defendant ATIF is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Orlando, Florida.  At all times, ATIF was authorized to do business, and was in fact doing business, in the State of Florida as a title insurance underwriter.

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 because it is a civil action commenced by the FDIC-R, which, for purposes of § 1345, is an agency of the United States.  In addition, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because all cases to which the FDIC-R is a party are deemed to arise under the laws of the United States, pursuant to 12 U.S.C. § 1819(b)(2)(A).

9.     Venue is proper in this forum under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in this District, and thirteen of the fourteen properties at issue in the Transactions are situated in this District.

## BACKGROUND

10.     Title insurers such as ATIF issue title insurance policies to lenders as a required part of financed residential real estate transactions.  These title insurance policies protect the lender from, among other things, defects in title on the property securing the loan.

11.     Residential loan transactions are customarily consummated by a closing agent, who is responsible for ensuring that the transactions are completed in accordance with the terms and manner approved by the lender, as a condition of providing the funds.  The loan funds are entrusted to the closing agent, along with the duty to execute and record essential documents and instruments and to disburse funds necessary to complete the transaction, all as directed by the lender.

12.     ATIF issues its title insurance for real estate transactions in Florida through issuing agents or approved attorneys selected by ATIF.  ATIF's issuing agents or approved attorneys often simultaneously serve as closing agents for the transaction in which they issue ATIF's title insurance products.  In that role, ATIF's closing agents are entrusted by lenders with their funds and documents, to act with all the obligations of a closing agent, and to act in exact accordance with the closing instructions provided by the lender.

13.     In order to induce the lender to entrust its closing agent with the loan funds and documents, ATIF issues a closing protection letter, or "CPL," to the lender.  Through the CPL, ATIF promises that it will reimburse the lender for any actual loss arising from the fraud or dishonesty of ATIF's issuing agents or approved attorneys when they serve as the closing agent for the transaction.  Through the promises contained in the CPL, ATIF facilitates and encourages the use of its issuing agents or approved attorneys as closing agents, and agrees to protect the lender in the event of misconduct by one of these closing agents.

14.     In each of the Transactions, ATIF's Agents served as the closing agent and through these Agents, ATIF sold title insurance products to WaMu and collected premiums. ATIF also issued CPLs to WaMu for each of the fourteen Transactions, which include the same material terms and state in pertinent part:

> When title insurance of Attorneys' Title Insurance Fund, Inc. is specified for your protection in connection with closings of real estate transactions in which you are to be . . . a lender secured by a mortgage (including any other security instrument) of an interest in land, the Attorneys' Title Insurance Fund, Inc., subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by said Issuing Agent or Approved Attorney when such loss arises out of:

1.      Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

2.      Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

Copies of the fourteen CPLs issued by ATIF to WaMu for the Transactions in question are attached as Exhibits A-N.

**THE FRAUDULENT AND DISHONEST**
**CONDUCT OF ATIF'S AGENTS**

15.      ATIF's Agents misappropriated millions of dollars of WaMu's funds in the fourteen Transactions described below, using falsified loan, settlement and accounting documents.  ATIF's Agents concealed this fraud from WaMu, and disbursed millions of dollars that resulted in at least $9.6 million in actual losses to WaMu for which reimbursement is required under the provisions of the CPLs.  The fraud, dishonesty, and failure to comply with WaMu's closing instructions of ATIF's Agents are set forth below.

A.      **Fraudulent and Dishonest Conduct of ATIF's Issuing Agent Michael I. Rose, P.A., and its Approved Attorney, Michael I. Rose**

16.      Michael I. Rose, P.A. was one of ATIF's issuing agents and its president, Michael I. Rose (collectively, "Rose"), was one of ATIF's approved attorneys.  In 2005, Rose defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.

5

17.     In April 2005, a borrower (the "Melaeuca Lane Borrower") entered into a contract to purchase residential property at 625 Melaeuca Lane, Miami, Florida, for $1,750,000 (the "Melaeuca Property Transaction").   The Melaeuca Lane Borrower applied for and received a first mortgage loan in the amount of $1,312,500 from WaMu to fund the purchase of this property.   WaMu approved the loan to the Melaeuca Lane Borrower to purchase the property subject to certain enumerated terms and conditions.

18.     ATIF's issuing agent and approved attorney, Rose, issued ATIF's title insurance and acted as closing agent.   ATIF issued a CPL protecting WaMu from Rose's fraudulent or dishonest actions with the closing of the Melaeuca Property Transaction.   A copy of this CPL (the "Melaeuca CPL") is included in Exhibit A.

19.     WaMu provided Rose with instructions specifying requirements for closing the transaction.   As closing agent, Rose agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender."  In June 2005, WaMu transferred the loan proceeds to Rose's account for the closing of the Melaeuca Property Transaction to disburse in the manner approved by WaMu.

20.     Rose closed the transaction on June 17, 2005 and disbursed WaMu's funds.   The HUD-1 Settlement Statement ("Settlement Statement") prepared and executed by Rose and

submitted to WaMu certified that the Melaeuca Lane Borrower had paid a $100,000 deposit and brought an additional $349,973.39 to close Melaeuca Property Transaction.  Rose further certified to WaMu that the Settlement Statement prepared by Rose was a true and accurate account of the transaction, and that Rose had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

21.     Unbeknownst to WaMu, Rose in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Rose prepared and submitted to WaMu was false since: (a) the Melaeuca Lane Borrower provided only $162,423.39 at the closing of the Melaeuca Property Transaction; and (b) it failed to disclose that the Melaeuca Lane Borrower funded a substantial portion of her down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $187,500.  Rose also failed to disclose to WaMu title commitments reflecting the National City Bank loan.  Rose concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

22.     The loan went into default in September 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Melaeuca Property Transaction is not less than $500,000.

### B. Fraudulent and Dishonest Conduct of ATIF's Issuing Agent S&W Group, LLC, and its Approved Attorney, Erik Wesoloski

23.     S&W Group, LLC ("S&W") was one of ATIF's issuing agents.  In June 2005, S&W defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.   S&W's managing members were Jose Sigui ("Sigui") and Erik Wesoloski ("Wesoloski").  Wesoloski was also the owner of S&W and an approved attorney of ATIF.

24.     In April 2005, Sigui entered into a contract to purchase a residential property at 1505 North Fort Lauderdale Beach Blvd., Fort Lauderdale, Florida from Juan Paredes ("Paredes") for $1,750,000 (the "1505 North Fort Lauderdale Property Transaction").  Sigui applied for and received a first mortgage loan in the amount of $1,400,000.  WaMu approved the loan to Sigui to purchase the property subject to certain enumerated terms and conditions, including the sale of property allegedly owned by Sigui, located at 1401 Coral Way, Unit 1504, Miami, Florida (the "1401 Coral Way Property").

25.     Also in April 2005, Wesoloski entered into a contract to purchase a residential property at 1501 North Fort Lauderdale Beach Blvd., Fort Lauderdale, Florida from Paredes for $1,950,000 (the "1501 North Fort Lauderdale Property Transaction").  Wesoloski applied for and received a first mortgage loan in the amount of $1,560,000.  WaMu approved the loan to Wesoloski to purchase the property subject to certain enumerated terms and conditions, including the sale of property allegedly owned by Wesoloski, located 2080 SW 60th Court, Miami, Florida (the "2080 SW 60th Court Property").

26.     ATIF's issuing agent, S&W, issued ATIF's title insurance and acted as the closing agent on both transactions.  ATIF issued CPLs protecting WaMu from S&W's fraudulent or dishonest actions in connection with the closings of the 1501 and 1505 North Fort Lauderdale Property Transactions.  A copy of the CPL relating to 1505 North Fort Lauderdale Property Transaction (the "1505 North Fort Lauderdale CPL") is included as Exhibit B.  A copy of the CPL relating to 1501 North Fort Lauderdale Property Transaction (the "1501 North Fort Lauderdale CPL") is included as Exhibit C.

27.     WaMu provided S&W with instructions specifying requirements for closing the transactions.  As closing agent, S&W agreed that it would comply with WaMu's instructions.  Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions.   As to the 1505 North Fort Lauderdale Property Transaction, one of the conditions stated: "At closing obtain copy of HUD-1 showing payoff of existing mortgages totaling $267,000 with GMAC & Wells Fargo, on property located at 1401 Coral Way, netting at least $197,000."   As to the 1501 North Fort Lauderdale Property Transaction, one of the additional conditions stated: "Copy of HUD-1 settlement statement on property located at 2080 SW 60 Court,[] Miami, fl., netting no less than $247[,]000 . . . ."

28.     In May 2005, S&W transmitted to WaMu title commitments that showed that the 1501 and 1505 North Fort Lauderdale Properties were titled in the name of Paredes as of that date, and that there were no other impediments that would prevent Sigui and Wesoloski from receiving good title at the closing of each respective transaction.   In June 2005, WaMu transferred the loan proceeds to S&W's account for the 1501 and 1505 North Fort Lauderdale Property Transactions to disburse in the manner approved by WaMu.

29.     S&W closed the 1501 and 1505 North Fort Lauderdale Property Transactions on June 20, 2005 and disbursed WaMu's funds.  S&W further certified to WaMu that the Settlement Statement prepared by S&W was a true and accurate account of the transaction, and that S&W had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

30.     Unbeknownst to WaMu, S&W was working in concert with Sigui, Wesoloski, and others to misappropriate WaMu's funds by falsely representing the terms of the transactions.

Paredes was not the record title owner of the 1501 and 1505 North Fort Lauderdale Property Transactions at the time Sigui and Wesoloski entered into the contracts to purchase these properties or at the time S&W provided the title commitments to WaMu in May 2005.  Rather, Old World Holdings, LLC and Old World Holdings II, LLC (together, "Old World") were the true record title owners of the 1501 and 1505 North Fort Lauderdale Properties, respectively, until the transfers of these properties took place on June 16, 2005.  The deeds transferring title from Old World to Paredes were not recorded until June 23, 2005, three days after the closing of the 1501 and 1505 North Fort Lauderdale Property Transactions.  Thus, the title commitments provided to WaMu the month prior to the closing misrepresented that Paredes owned the 1501 and 1505 North Fort Lauderdale Properties at that time.

31.     In addition, the Settlement Statements provided by S&W to allegedly document the sales of the 1401 Coral Way and 2080 SW 60th Court Properties were fictitious as they described sales that never occurred.  As a result, S&W closed the 1501 and 1505 North Fort Lauderdale Property Transactions and disbursed WaMu's loan proceeds without complying with WaMu's loan conditions in violation of the express closing instructions.  In doing so, S&W misrepresented to WaMu the nature of the transactions and misappropriated WaMu's funds by disbursing them in a manner not agreed to by WaMu.  The actions taken by S&W in the 1501 and 1505 North Fort Lauderdale Property Transactions demonstrate that it acted fraudulently and dishonestly in handling WaMu's funds and documents and failed to comply with WaMu's closing instructions.

32.     The loans went into default in April 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent 1505 North Fort Lauderdale Property

Transaction is not less than $845,000.  WaMu's actual loss on the fraudulent 1501 North Fort Lauderdale Property Transaction is not less than $1,045,000.  WaMu's total aggregated losses on these loans are not less than $1.89 million.

  **C.**  **Fraudulent and Dishonest Conduct of ATIF's Issuing Agent and Approved Attorney, Rafael Ubieta**

  33.  In 2006, attorney Rafael Ubieta, in his capacity as principal of The Law Office of Rafael Ubieta and Bayside Title Services, Inc. (collectively, "Ubieta"), defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.  In his roles as closing agent, and approved attorney and issuing agent for ATIF, Ubieta misrepresented information on the Settlement Statement submitted to WaMu in that he failed to disclose the existence of a loan from another bank which was documented and recorded in second position behind the loan procured from WaMu.

  34.  In September 2006, a borrower (the "Breakwater Court Borrower") entered into a contract to purchase residential property at 1106 Breakwater Court, Marco Island, Florida, for $1,245,000 (the "Breakwater Property Transaction").  The Breakwater Court Borrower applied for and received a first mortgage loan in the amount of $933,500 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Breakwater Court Borrower to purchase the property subject to certain enumerated terms and conditions.

  35.  ATIF's issuing agent and approved attorney, Ubieta, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Ubieta's fraudulent or dishonest actions in connection with the closing of the Breakwater Property Transaction.  A copy of this CPL (the "Breakwater CPL") is included in Exhibit D.

36.     WaMu provided Ubieta with instructions specifying requirements for closing the transaction.  As closing agent, Ubieta agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing [was] allowed on this transaction."  In October 2006, WaMu transferred the loan proceeds to Ubieta's account for the closing of the Breakwater Property Transaction to disburse in the manner approved by WaMu.

37.     Ubieta closed the transaction on October 19, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Ubieta and submitted to WaMu certified that the Breakwater Court Borrower had brought $343,197.29 in funds to the closing of the Breakwater Property Transaction.   Ubieta further certified to WaMu that the Settlement Statement prepared by Ubieta was a true and accurate account of the transaction, and that Ubieta had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

38.     Unbeknownst to WaMu, Ubieta in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Ubieta prepared and submitted to WaMu was false since: (a) the Breakwater Court Borrower provided only $157,455.74 at the closing of the Breakwater Property Transaction; and (b) it failed to disclose

that the Breakwater Court Borrower funded a substantial portion of his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $186,900.  Ubieta concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.  Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Ubieta prepared and provided to WaMu a falsified Title Commitment, which failed to disclose the existence of the National City Bank loan.

39.     The loan went into default in March 2008 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Breakwater Property Transaction is not less than $680,000.

**D.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent, Ryan T. Dosen, PL, and its Approved Attorney, Ryan T. Dosen**

40.     Ryan T. Dosen, P.L. was one of ATIF's issuing agents and its principal, Ryan T. Dosen (collectively, "Dosen"), was one of ATIF's approved attorneys.  Beginning in 2006, Dosen defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.  Dosen, in his roles as closing agent, and issuing agent and approved attorney for ATIF, misrepresented information on the Settlement Statements submitted to WaMu by failing to disclose the existence of second mortgages or private loans which were used to fund the down payments of the subject properties.  Dosen also made improper disbursements without advising WaMu that the loan proceeds were being used in a manner inconsistent from WaMu's closing instructions and materially different from the Settlement Statements recording the receipts and disbursements of the transaction funds.  Dosen acted fraudulently and dishonestly in handling WaMu's funds in the five transactions detailed below.

**(1)      3022 Indiana Street, Miami, Florida**

41.      In October 2006, a borrower (the "Indiana Street Borrower") entered into a contract to purchase residential property at 3022 Indiana Street, Miami, Florida, for $950,000 (the "Indiana Street Property Transaction").   The Indiana Street Borrower applied for and received a first mortgage loan in the amount of $760,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Indiana Street Borrower to purchase the property subject to certain enumerated terms and conditions.

42.      ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.   ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the Indiana Street Property Transaction.  A copy of this CPL (the "Indiana Street CPL") is included in Exhibit E.

43.      WaMu provided Dosen with instructions specifying requirements for closing the transaction.  As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed."  In December 2006, WaMu transferred the loan proceeds to Dosen's account for the closing of the Indiana Street Property Transaction to disburse in the manner approved by WaMu.

14

44. Dosen closed the transaction on December 20, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the Indiana Street Borrower had brought $183,939.52 in funds to the closing of the Indiana Street Property Transaction, and that there was no other financing provided to the Indiana Street Borrower that reduced the amount of his down payment obligation at the closing of the Indiana Street Property Transaction. Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

45. Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the Indiana Street Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by Aegis Funding in the amount of $190,000. Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement. Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which also failed to disclose the existence of the second mortgage by Aegis Funding.

46.     The loan went into default in October 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Indiana Street Property Transaction is not less than $415,000.

(2)     **400 Alton Road, #411, Miami Beach, Florida**

47.     In November 2006, a borrower (the "Alton Road Borrower") entered into a contract to purchase residential property at 400 Alton Road, #411, Miami Beach, Florida, for $1,400,000 (the "Alton Property Transaction").  The Alton Road Borrower applied for and received a first mortgage loan in the amount of $1,120,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Alton Road Borrower to purchase the property subject to certain enumerated terms and conditions.

48.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the Alton Property Transaction.  A copy of this CPL (the "Alton CPL") is included in Exhibit F.

49.     WaMu provided Dosen with instructions specifying requirements for closing the transaction.  As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the

16

Lender," and "No subordinate financing is allowed."  In December 2006, WaMu transferred the loan proceeds to Dosen's account for the closing of the Alton Property Transaction to disburse in the manner approved by WaMu.

50.     Dosen closed the transaction on December 22, 2006 and disbursed WaMu's funds.  The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the Alton Road Borrower had brought $227,416.92 in funds to the closing of the Alton Property Transaction, and that there was no other financing provided to the Alton Road Borrower that reduced the amount of his down payment obligation at the closing of the Alton Property Transaction.  Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

51.     Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the Alton Road Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $250,000.  Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.  Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which also failed to disclose the existence of the second mortgage by National City Bank.

52.     The loan went into default in March 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Alton Property Transaction is not less than $465,000.

        **(3)     1200 West Avenue, #1102, Miami Beach, Florida**

53.     In December 2006, a borrower (the "West Avenue Borrower") entered into a contract to purchase residential property at 1200 West Avenue, #1102, Miami Beach, Florida, for $299,000 (the "West Avenue Property Transaction").  The West Avenue Borrower applied for and received a first mortgage loan in the amount of $239,200 from WaMu to fund the purchase of this property.  WaMu approved the loan to the West Avenue Borrower to purchase the property subject to certain enumerated terms and conditions.

54.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the West Avenue Property Transaction.  A copy of this CPL (the "West Avenue CPL") is included in Exhibit G.

55.     WaMu provided Dosen with instructions specifying requirements for closing the transaction.  As closing agent, Dosen agreed that he would comply with WaMu's instructions.  Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the

18

Lender," and "No subordinate financing is allowed."  In February 2007, WaMu transferred the loan proceeds to Dosen's account for the closing of the West Avenue Property Transaction to disburse in the manner approved by WaMu.

56.    Dosen closed the transaction on February 5, 2007 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the West Avenue Borrower had brought $49,335.36 in funds to the closing of the West Avenue Property Transaction, that $5,049.62 had been provided as a seller contribution, and that there was no other financing provided to the West Avenue Borrower that reduced the amount of her down payment obligation at the closing of the West Avenue Property Transaction.  Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

57.    Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Dosen prepared and submitted to WaMu was false, since the only funds brought to close the West Avenue Property Transaction, approximately $49,360.36, were actually paid by a mortgage broker, who took a junior mortgage lien against the subject property.  Accordingly, the West Avenue Borrower made no actual down payment and received prohibited secondary financing.  Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.  Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen

prepared and provided to WaMu a falsified Title Commitment, which also failed to disclose the source of the down payment funds.

58.     The loan went into default in November 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent West Avenue Property Transaction is not less than $135,000.

**(4)     3029 NE 188th Street, #422, Miami, Florida**

59.     In March 2007,  a borrower (the "188th Street Borrower") entered into a contract to purchase residential property at 3029 NE 188th Street, #422, Miami, Florida, for $627,700 (the "188th Street Property Transaction").  The 188th Street Borrower applied for and received a first mortgage loan in the amount of $502,160 from WaMu to fund the purchase of this property. WaMu approved the loan to the 188th Street Borrower to purchase the property subject to certain enumerated terms and conditions.

60.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the 188th Street Property Transaction.  A copy of this CPL (the "188th Street CPL") is included in Exhibit H.

61.     WaMu provided Dosen with instructions specifying requirements for closing the transaction.  As closing agent, Dosen agreed that he would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be

20

otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed."  In June 2007, WaMu transferred the loan proceeds to Dosen's account for the closing of the 188th Street Property Transaction to disburse in the manner approved by WaMu.

62.    Dosen closed the transaction on June 5, 2007 and disbursed WaMu's funds.  The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the 188th Street Borrower had paid a $5,000 deposit prior to the closing of the 188th Street Property Transaction, the 188th Street Borrower had brought $146,528.88 in funds to the closing of the 188th Street Property Transaction, and that there was no other financing provided to the 188th Street Borrower that reduced the amount of his down payment obligation at the closing of the 188th Street Property Transaction.  Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

63.    Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the 188th Street Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by Countrywide in the amount of $200,000.  The Settlement Statement was also false in that the seller, not the 188th Street Borrower, paid the $5,000 initial deposit into escrow.  Dosen also

improperly disbursed $44,243.48 of WaMu's funds directly to the 188th Street Borrower.  Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.  Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Dosen prepared and provided to WaMu a falsified Title Commitment, which failed to disclose the existence of the second mortgage by Countrywide.

64.     The loan went into default in January 2008 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent 188th Street Property Transaction is not less than $175,000.

### (5)     11145 NW 78th Lane, Miami, Florida

65.     In April 2007, a borrower (the "78th Lane Borrower") entered into a contract to purchase residential property at 11145 NW 78th Lane, Miami, Florida, for $1,250,000 (the "78th Lane Property Transaction").  The 78th Lane Borrower applied for and received a first mortgage loan in the amount of $1,000,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the 78th Lane Borrower to purchase the property subject to certain enumerated terms and conditions.

66.     ATIF's issuing agent and approved attorney, Dosen, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Dosen's fraudulent or dishonest actions in connection with the closing of the 78th Lane Property Transaction.  A copy of this CPL (the "78th Lane CPL") is included in Exhibit I.

67.     WaMu provided Dosen with instructions specifying requirements for closing the transaction.  As closing agent, Dosen agreed that he would comply with WaMu's instructions.

Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed."  In June 2007, WaMu transferred the loan proceeds to Dosen's account for the closing of the 78th Lane Property Transaction to disburse in the manner approved by WaMu.

68.     Dosen closed the transaction on June 29, 2007 and disbursed WaMu's funds.  The Settlement Statement prepared and executed by Dosen and submitted to WaMu certified that the 78th Lane Borrower had brought $244,177.72 in funds to the closing of the 78th Lane Property Transaction, and that there was no financing or credits provided to the 78th Lane Borrower that reduced the amount of his down payment obligation at the closing of the 78th Lane Property Transaction.  Dosen further certified to WaMu that the Settlement Statement prepared by Dosen was a true and accurate account of the transaction, and that Dosen had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

69.     Unbeknownst to WaMu, Dosen in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  Contrary to the requirements of the closing conditions and the representations made in the Settlement Statement prepared by Dosen and submitted to WaMu, the 78th Lane Borrower did not provide any down payment funds at the closing and, instead, funded his down payment obligation with an undisclosed second mortgage by National

City Bank in the amount of $124,900.  The Settlement Statement was also false since it failed to disclose that the seller provided $151,546.87 in credits to the 78th Lane Borrower in lieu of the 78th Lane Borrower providing the remainder of the down payment.  Dosen also improperly disbursed WaMu's funds over a period of months after the closing of the 78th Lane Property Transaction to parties that were not disclosed on the Settlement Statement as receiving disbursements.  Dosen concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

70.   The loan went into default in March 2008 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent 78th Lane Property Transaction is not less than $565,000.

**E.   Fraudulent and Dishonest Conduct of ATIF's Approved Attorney and Issuing Agent, Aubrey G. Rudd**

71.   Aubrey G. Rudd ("Rudd") was one of ATIF's issuing agents and approved attorneys.  Beginning in 2006, Rudd defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.  Rudd, acting in his roles as closing agent, and approved attorney and issuing agent for ATIF, misrepresented information on the Settlement Statements submitted to WaMu by failing to disclose the existence of a loan from another bank which was documented and recorded in second position behind the loan procured from WaMu.

72.   Rudd also improperly disbursed proceeds to parties not disclosed on the Settlement Agreements, without advising WaMu that the loan proceeds were being used in a manner inconsistent from WaMu's closing instructions and materially different from the Settlement Statements recording the receipts and disbursements of the transaction funds.  Rudd

acted fraudulently and dishonestly in handling WaMu's funds in the three transactions detailed below.

### (1)     213 Water Way, Miami Beach, Florida

73.     On or about October 2006, a borrower (the "Water Way Borrower") entered into a contract to purchase residential property at 213 Water Way, Miami Beach, Florida, for $3,300,000 (the "Water Way Property Transaction").  The Water Way Borrower applied for and received a first mortgage loan in the amount of $2,640,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Water Way Borrower to purchase the property subject to certain enumerated terms and conditions.

74.     ATIF's issuing agent and approved attorney, Rudd, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Rudd's fraudulent or dishonest actions in connection with the closing of the Water Way Property Transaction.  A copy of this CPL (the "Water Way CPL") is included in Exhibit J.

75.     WaMu provided Rudd with instructions specifying requirements for closing the transaction.  As closing agent, Rudd agreed that he would comply with WaMu's instructions.  Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "No subordinate financing is allowed."  In November 2006, WaMu transferred the

loan proceeds to Rudd's account for the closing of the Water Way Property Transaction to disburse in the manner approved by WaMu.

76.     Rudd closed the transaction on November 29, 2006 and disbursed WaMu's funds. The Settlement Statement prepared and executed by Rudd and submitted to WaMu certified that the Water Way Borrower had brought $630,136.32 in funds to the closing of the Water Way Property Transaction, $1,508,333.68 was disbursed to the seller, and that there was no other financing provided to the Water Way Borrower that reduced the amount of his down payment obligation at the closing of the Water Way Property Transaction.  Rudd further certified to WaMu that the Settlement Statement prepared by Rudd was a true and accurate account of the transaction, and that Rudd had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

77.     Unbeknownst to WaMu, Rudd in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that Rudd prepared and submitted to WaMu was false since: (a) it failed to disclose that the Water Way Borrower funded a substantial portion of his down payment obligation with an undisclosed second mortgage by National City Bank in the amount of $328,000; and (b) no sale proceeds were disbursed to the seller.  Instead, Rudd improperly disbursed $1,241,481 of WaMu's funds to entities not disclosed on the Settlement Statement.  Rudd concealed the true nature of the transaction and this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement. Moreover, to support the falsified Settlement Statement and to further conceal his failure to comply with WaMu's closing instructions, Rudd prepared and provided to WaMu a falsified Title Commitment, which failed to disclose the existence of the National City Bank loan.

26

78.     The loan went into default in September 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Water Way Property Transaction is not less than $1,150,000.

**(2)     3615 Battersea Road, Miami, Florida**

79.     In May 2007, a borrower (the "Battersea Road Borrower") entered into a contract to purchase residential property at 3615 Battersea Road, Miami, Florida, for $2,800,000 (the "Battersea Property Transaction").  The Battersea Road Borrower applied for and received a first mortgage loan in the amount of $2,240,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Battersea Road Borrower to purchase the property subject to certain enumerated terms and conditions.

80.     ATIF's issuing agent and approved attorney, Rudd, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Rudd's fraudulent or dishonest actions in connection with the closing of the Battersea Property Transaction.  A copy of this CPL (the "Battersea CPL") is included in Exhibit K.

81.     WaMu provided Rudd with instructions specifying requirements for closing the transaction.  As closing agent, Rudd agreed that he would comply with WaMu's instructions.  Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the

Lender." In July 2007, WaMu transferred the loan proceeds to Rudd's account for the closing of the Battersea Property Transaction to disburse in the manner approved by WaMu.

82. Rudd closed the transaction on July 12, 2007 and disbursed WaMu's funds. The Settlement Statement prepared by Rudd and submitted to WaMu certified that the Battersea Road Borrower had brought $541,103.70 in funds to the closing of the Battersea Property Transaction, $1,213,355.70 was disbursed to the seller, and that there was no other financing provided to the Battersea Road Borrower that reduced the amount of his down payment obligation at the closing of the Battersea Property Transaction. Rudd further certified to WaMu that the Settlement Statement prepared by Rudd was a true and accurate account of the transaction, and that Rudd had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

83. Unbeknownst to WaMu, Rudd in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner. The Settlement Statement that Rudd prepared and submitted to WaMu was false since: (a) the Battersea Road Borrower provided no funds to close the Battersea Property Transaction; and (b) only $643,154.66 was disbursed to the seller, rather than the $1,213,355.70 represented in the Settlement Statement. Rudd concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

84. The loan went into default in November 2007 and WaMu suffered substantial damages. WaMu's actual loss on the fraudulent Battersea Property Transaction is not less than $625,000.

### (3)     211 Ari Way, Miami Beach, Florida

85.     In April 2007, a borrower (the "Ari Way Borrower") entered into a contract to purchase residential property at 211 Ari Way, Miami Beach, Florida, for $3,500,000 (the "Ari Way Property Transaction").  The Ari Way Borrower applied for and received a first mortgage loan in the amount of $2,625,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Ari Way Borrower to purchase the property subject to certain enumerated terms and conditions, including the Ari Way Borrower's promise to obtain a second position purchase money loan for $350,000 from an outside lender, which the Ari Way Borrower thereafter obtained through National Home Equity (the "National Loan").

86.     ATIF's issuing agent and approved attorney, Rudd, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from Rudd's fraudulent or dishonest actions in connection with the closing of the Ari Way Property Transaction.  A copy of this CPL (the "Ari Way CPL") is included in Exhibit L.

87.     WaMu provided Rudd with instructions specifying requirements for closing the transaction.  As closing agent, Rudd agreed that he would comply with WaMu's instructions.  Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the

Lender."  In July 2007, WaMu transferred the loan proceeds to Rudd's account for the closing

of the Ari Way Property Transaction to disburse in the manner approved by WaMu.

      88.    Rudd closed the transaction on July 31, 2007 and disbursed WaMu's funds.  The

Settlement Statement prepared and executed by Rudd and submitted to WaMu certified that the

Ari Way Borrower had brought $914,082.21 in funds to the closing of the Ari Way Property

Transaction (which was comprised of $572,630 in cash from the Ari Way Borrower and the

proceeds from the National Loan), $1,185,462.20 was disbursed to the seller, and that, besides

the WaMu loan and the National Loan, there was no other financing provided to the Ari Way

Borrower that reduced the amount of her down payment obligation at the closing of the Ari Way

Property Transaction.  Rudd further certified to WaMu that the Settlement Statement prepared by

Rudd was a true and accurate account of the transaction, and that Rudd had caused or would

cause the funds to be disbursed in accordance with the Settlement Statement.

      89.    Unbeknownst to WaMu, Rudd in fact had procured and disbursed WaMu's funds

in a fraudulent and dishonest manner.  The Settlement Statement that Rudd prepared and

submitted to WaMu was false since: (a) the Ari Way Borrower provided no funds to close the

Ari Way Property Transaction, leaving the transaction under-funded in the amount of

$572,630.20; and (b) the seller received no proceeds from the Ari Way Property Transaction.

Instead, Rudd improperly disbursed $612,832 of WaMu's funds to parties that were not

disclosed on the Settlement Statement as receiving disbursements.   Rudd concealed this

misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

90.     The loan went into default in September 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Ari Way Property Transaction is not less than $910,000.

**F.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent, Anett López, P.A., and its Approved Attorney, Anett López**

91.     Anett López, P.A. was one of ATIF's issuing agents and its principal, Anett López (collectively, "López"), was one of ATIF's approved attorneys.  In 2007, López defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.

92.     In May 2007, a borrower (the "Bass Avenue Borrower") entered into a contract to purchase residential property at 76 Bass Avenue, Key Largo, Florida, for $2,200,000 (the "Bass Avenue Property Transaction").  The Bass Avenue Borrower applied for and received a first mortgage loan in the amount of $1,760,000 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Bass Avenue Borrower to purchase the property subject to certain enumerated terms and conditions.

93.     ATIF's issuing agent and approved attorney, López, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from López's fraudulent or dishonest actions in connection with the closing of the Bass Avenue Property Transaction.  A copy of this CPL (the "Bass Avenue CPL") is included in Exhibit M.

94.     WaMu provided López with instructions specifying requirements for closing the transaction.  As closing agent, López agreed that she would comply with WaMu's instructions.  Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or

amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender," and "no subordinate financing" was allowed on this transaction.  In June 2007, WaMu transferred the loan proceeds to López's account for the closing of the Bass Avenue Property Transaction to disburse in the manner approved by WaMu.

95.     López closed the transaction on June 18, 2007 and disbursed WaMu's funds.  The Settlement Statement prepared and executed by López and submitted to WaMu certified that the Bass Avenue Borrower had brought $505,355.98 in funds to the closing of the Bass Avenue Property Transaction, $1,664,094.37 was to be disbursed to the seller, and that there was no other financing or credits provided to the Bass Avenue Borrower that reduced the amount of her down payment obligation at the closing of the Bass Avenue Property Transaction.  López further certified to WaMu that the Settlement Statement prepared by López was a true and accurate account of the transaction, and that López had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

96.     Unbeknownst to WaMu, López in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  The Settlement Statement that López prepared and submitted to WaMu was false since: (a) the Bass Avenue Borrower provided no funds to close the Bass Avenue Property Transaction; (b) it failed to disclose that the seller provided credits to the Bass Avenue Borrower, in the form of a $131,811.98 "Closing Cost Credit" and a $350,000 "Boat Dock Repair" credit, in lieu of the remainder of the down payment; (c) an undisclosed disbursement in the amount of $298,262.92 was made to Regions Bank; and (d) the seller was

paid only $883,869.47.  López concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

97.     The loan went into default in December 2007 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Bass Avenue Property Transaction is not less than $1,300,000.

> **G.     Fraudulent and Dishonest Conduct of ATIF's Issuing Agent, Kramer & Golden, P.A., and its Approved Attorney, Richard Golden**

98.     Kramer & Golden, P.A. was one of ATIF's issuing agents, and its principal attorney, Richard Golden (collectively, "K&G"), was one of ATIF's approved attorneys.   In 2007, K&G defrauded WaMu of loan funds in connection with the purchase of residential real estate in Florida.

99.     In September 2007, a borrower (the "Alamanda Drive Borrower") entered into a contract to purchase residential property at 2190 Alamanda Drive, North Miami, Florida, for $1,580,000 (the "Alamanda Property Transaction").  The Alamanda Drive Borrower applied for and received a first mortgage loan in the amount of $1,264,000 and a second mortgage loan in the amount of $157,842 from WaMu to fund the purchase of this property.  WaMu approved the loan to the Alamanda Drive Borrower to purchase the property subject to certain enumerated terms and conditions.

100.    ATIF's issuing agent and approved attorney, K&G, issued ATIF's title insurance and acted as closing agent.  ATIF issued a CPL protecting WaMu from K&G's fraudulent or dishonest actions in connection with the closing of the Alamanda Property Transaction.  A copy of this CPL (the "Alamanda CPL") is included in Exhibit N.

101.     WaMu provided K&G with instructions specifying requirements for closing the transaction.  As closing agent, K&G agreed that it would comply with WaMu's instructions. Among other things, those instructions specified that disbursement of WaMu's funds was subject to satisfaction of all loan conditions, that "[y]our closing of this transaction will be in total conformance with the Earnest Money/Purchase and Sale Agreement and any addenda or amendments," that this is to be an "all-cash transaction, unless specifically shown to be otherwise in the Earnest Money/Purchase and Sale Agreement," and that "[t]here is not to be any other financing, secondary financing, or other charges without express written approval from the Lender."   In October 2007, WaMu transferred the loan proceeds to K&G's account for the closing of the Alamanda Property Transaction to disburse in the manner approved by WaMu.

102.     K&G closed the transaction on October 19, 2007 and disbursed WaMu's funds. The Settlement Statement prepared and executed by K&G and submitted to WaMu certified that: (a) the Alamanda Drive Borrower had brought $86,169.47 in funds to the closing of the Alamanda Property Transaction; (b) $317,470.94 was to be disbursed to the sellers; (c) $211,000 would be paid to Commercial Residential & Design, Inc. for remodeling; and (d) there was no other financing or credits provided to the Alamanda Drive Borrower that reduced the amount of the down payment obligation at the closing of the Alamanda Property Transaction.  K&G further certified to WaMu that the Settlement Statement prepared by K&G was a true and accurate account of the transaction, and that K&G had caused or would cause the funds to be disbursed in accordance with the Settlement Statement.

103.     Unbeknownst to WaMu, K&G in fact had procured and disbursed WaMu's funds in a fraudulent and dishonest manner.  On information and belief, the Settlement Statement that

34

K&G prepared and submitted to WaMu was false since: (a) the Alamanda Drive Borrower provided no funds to close the Alamanda Property Transaction; (b) it failed to disclose that, in lieu of the remainder of the down payment, the seller provided credits to the Alamanda Drive Borrower, in the form of a $47,400 credit towards the Alamanda Drive Borrower's closing costs or discount points, a $50,000 credit in the form of a one year "purchase money mortgage" provided by the sellers, and a $216,000 credit for "remodeling" the property; (c) the sellers were actually paid $252,470.94; and (d) Commercial Residential & Design, Inc. was only paid $124,810.53, rather than the $211,000 reflected in the Settlement Statement.  K&G concealed this misappropriation of WaMu's funds by providing WaMu with a falsified Settlement Statement.

104.   The loans went into default in March 2008 and WaMu suffered substantial damages.  WaMu's actual loss on the fraudulent Alamanda Property Transaction is not less than $730,000.

## WAMU HAS SUFFERED EXTENSIVE LOSSES BECAUSE OF ATIF'S FAILURE TO HONOR ITS CPL OBLIGATIONS

105.   The fraud, dishonesty, and failure to comply with WaMu's closing instructions of ATIF's approved attorneys and issuing agents have caused extensive losses to WaMu.  WaMu would not have made the loans or dispersed any of the funds at the closings described above if it had known of the fraud, dishonesty, and failure to comply with WaMu's closing instructions by ATIF's Agents.

106.   In its capacity as receiver for WaMu, the FDIC-R provided ATIF with timely notice of its claims under the CPLs.  The FDIC-R's CPL claims sought reimbursement for WaMu's actual losses arising out of the fraud and dishonesty of ATIF's Agents in connection

with each of the Transactions.  To date, ATIF has failed to reimburse the FDIC-R for any of the actual losses suffered as required under its CPLs.

## COUNT ONE
### (Breach of Contract - Melaeuca Property Transaction)

107.    The FDIC-R hereby incorporates Paragraphs 1 through 22, 105, and 106 of its FAC as Paragraph 107 of this Count One as though fully set forth herein.

108.    The Melaeuca CPL is a valid and binding contract between the FDIC-R and ATIF.

109.    The Melaeuca CPL requires ATIF to reimburse the FDIC-R for losses that result from Rose's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Melaeuca Property Transaction.

110.    Rose engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Melaeuca Property Transaction, and the FDIC-R has experienced significant losses as a result.

111.    ATIF has breached the Melaeuca CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rose in connection with the Melaeuca Property Transaction.

112.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Melaeuca CPL.

113.    The FDIC-R and WaMu have performed all obligations required of them under the Melaeuca CPL, and all conditions in the Melaeuca CPL for the reimbursement of losses by ATIF have been met.

114.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $500,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Melaeuca CPL and prosecuting this action.

## COUNT TWO
### (Breach of Contract - 1505 North Fort Lauderdale Property Transaction)

115.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 23 through 32, 105, and 106 of its FAC as Paragraph 115 of this Count Two as though fully set forth herein.

116.    The 1505 North Fort Lauderdale CPL is a valid and binding contract between the FDIC-R and ATIF.

117.    The 1505 North Fort Lauderdale CPL requires ATIF to reimburse the FDIC-R for losses that result from S&W's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the 1505 North Fort Lauderdale Property Transaction.

118.    S&W engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the 1505 North Fort Lauderdale Property Transaction, and the FDIC-R has experienced significant losses as a result.

119.    ATIF has breached the 1505 North Fort Lauderdale CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by S&W in connection with the 1505 North Fort Lauderdale Property Transaction.

120.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the 1505 North Fort Lauderdale CPL.

121.    The FDIC-R and WaMu have performed all obligations required of them under the 1505 North Fort Lauderdale CPL, and all conditions in the 1505 North Fort Lauderdale CPL for the reimbursement of losses by ATIF have been met.

122.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $845,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the 1505 North Fort Lauderdale CPL and prosecuting this action.

### COUNT THREE
**(Breach of Contract - 1501 North Fort Lauderdale Property Transaction)**

123.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 23 through 32, 105, and 106 of its FAC as Paragraph 123 of this Count Three as though fully set forth herein.

124.    The 1501 North Fort Lauderdale CPL is a valid and binding contract between the FDIC-R and ATIF.

125.    The 1501 North Fort Lauderdale CPL requires ATIF to reimburse the FDIC-R for losses that result from S&W's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the 1501 North Fort Lauderdale Property Transaction.

126.    S&W engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the 1501 North Fort Lauderdale Property Transaction, and the FDIC-R has experienced significant losses as a result.

127.    ATIF has breached the 1501 North Fort Lauderdale CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to

comply with WaMu's closing instructions by S&W in connection with the 1501 North Fort Lauderdale Property Transaction.

128.     The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the 1501 North Fort Lauderdale CPL.

129.     The FDIC-R and WaMu have performed all obligations required of them under the 1501 North Fort Lauderdale CPL, and all conditions in the 1501 North Fort Lauderdale CPL for the reimbursement of losses by ATIF have been met.

130.     As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $1,045,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the 1501 North Fort Lauderdale CPL and prosecuting this action.

## COUNT FOUR
### (Breach of Contract - Breakwater Property Transaction)

131.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 33 through 39, 105, and 106 of its FAC as Paragraph 131 of this Count Four as though fully set forth herein.

132.     The Breakwater CPL is a valid and binding contract between the FDIC-R and ATIF.

133.     The Breakwater CPL requires ATIF to reimburse the FDIC-R for losses that result from Ubieta's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Breakwater Property Transaction.

134.     Ubieta engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Breakwater Property Transaction, and the FDIC-R has experienced significant losses as a result.

135.    ATIF has breached the Breakwater CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Ubieta in connection with the Breakwater Property Transaction.

136.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Breakwater CPL.

137.    The FDIC-R and WaMu have performed all obligations required of them under the Breakwater CPL, and all conditions in the Breakwater CPL for the reimbursement of losses by ATIF have been met.

138.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $680,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Breakwater CPL and prosecuting this action.

### COUNT FIVE
### (Breach of Contract - Indiana Street Property Transaction)

139.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 40 through 46, 105, and 106 of its FAC as Paragraph 139 of this Count Five as though fully set forth herein.

140.    The Indiana Street CPL is a valid and binding contract between the FDIC-R and ATIF.

141.    The Indiana Street CPL requires ATIF to reimburse the FDIC-R for losses that result from Dosen's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Indiana Street Property Transaction.

40

142.     Dosen engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Indiana Street Property Transaction, and the FDIC-R has experienced significant losses as a result.

143.     ATIF has breached the Indiana Street CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen in connection with the Indiana Street Property Transaction.

144.     The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Indiana Street CPL.

145.     The FDIC-R and WaMu have performed all obligations required of them under the Indiana Street CPL, and all conditions in the Indiana Street CPL for the reimbursement of losses by ATIF have been met.

146.     As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $415,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Indiana Street CPL and prosecuting this action.

## COUNT SIX
**(Breach of Contract - Alton Property Transaction)**

147.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 47 through 52, 105, and 106 of its FAC as Paragraph 147 of this Count Six as though fully set forth herein.

148.     The Alton CPL is a valid and binding contract between the FDIC-R and ATIF.

149.    The Alton CPL requires ATIF to reimburse the FDIC-R for losses that result from Dosen's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Alton Property Transaction.

150.    Dosen engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Alton Property Transaction, and the FDIC-R has experienced significant losses as a result.

151.    ATIF has breached the Alton CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen in connection with the Alton Property Transaction.

152.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Alton CPL.

153.    The FDIC-R and WaMu have performed all obligations required of them under the Alton CPL, and all conditions in the Alton CPL for the reimbursement of losses by ATIF have been met.

154.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $465,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Alton CPL and prosecuting this action.

## COUNT SEVEN
### (Breach of Contract - West Avenue Property Transaction)

155.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 53 through 58, 105, and 106 of its FAC as Paragraph 155 of this Count Seven as though fully set forth herein.

156.    The West Avenue CPL is a valid and binding contract between the FDIC-R and ATIF.

157.    The West Avenue CPL requires ATIF to reimburse the FDIC-R for losses that result from Dosen's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the West Avenue Property Transaction.

158.    Dosen engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the West Avenue Property Transaction, and the FDIC-R has experienced significant losses as a result.

159.    ATIF has breached the West Avenue CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen in connection with the West Avenue Property Transaction.

160.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the West Avenue CPL.

161.    The FDIC-R and WaMu have performed all obligations required of them under the West Avenue CPL, and all conditions in the West Avenue CPL for the reimbursement of losses by ATIF have been met.

162.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $175,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the West Avenue CPL and prosecuting this action.

<u>COUNT EIGHT</u>
(Breach of Contract - 188th Street Property Transaction)

163.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 59 through 64, 105, and 106 of its FAC as Paragraph 163 of this Count Eight as though fully set forth herein.

164.     The 188th Street CPL is a valid and binding contract between the FDIC-R and ATIF.

165.     The 188th Street CPL requires ATIF to reimburse the FDIC-R for losses that result from Dosen's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the 188th Street Property Transaction.

166.     Dosen engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the 188th Street Property Transaction, and the FDIC-R has experienced significant losses as a result.

167.     ATIF has breached the 188th Street CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen in connection with the 188th Street Property Transaction.

168.     The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the 188th Street CPL.

169.     The FDIC-R and WaMu have performed all obligations required of them under the 188th Street CPL, and all conditions in the 188th Street CPL for the reimbursement of losses by ATIF have been met.

170.     As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $135,000, with

appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the 188th Street CPL and prosecuting this action.

<u>**COUNT NINE**</u>
**(Breach of Contract - 78th Lane Property Transaction)**

171. The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 65 through 70, 105, and 106 of its FAC as Paragraph 171 of this Count Nine as though fully set forth herein.

172. The 78th Lane CPL is a valid and binding contract between the FDIC-R and ATIF.

173. The 78th Lane CPL requires ATIF to reimburse the FDIC-R for losses that result from Dosen's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the 78th Lane Property Transaction.

174. Dosen engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the 78th Lane Property Transaction, and the FDIC-R has experienced significant losses as a result.

175. ATIF has breached the 78th Lane CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen in connection with the 78th Lane Property Transaction.

176. The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the 78th Lane CPL.

177. The FDIC-R and WaMu have performed all obligations required of them under the 78th Lane CPL, and all conditions in the 78th Lane CPL for the reimbursement of losses by ATIF have been met.

178. As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $565,000, with

appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the 78th Lane CPL and prosecuting this action.

## COUNT TEN
### (Breach of Contract - Water Way Property Transaction)

179.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 71 through 78, 105, and 106 of its FAC as Paragraph 179 of this Count Ten as though fully set forth herein.

180.     The Water Way CPL is a valid and binding contract between the FDIC-R and ATIF.

181.     The Water Way CPL requires ATIF to reimburse the FDIC-R for losses that result from Rudd's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Water Way Property Transaction.

182.     Rudd engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Water Way Property Transaction, and the FDIC-R has experienced significant losses as a result.

183.     ATIF has breached the Water Way CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd in connection with the Water Way Property Transaction.

184.     The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Water Way CPL.

185.     The FDIC-R and WaMu have performed all obligations required of them under the Water Way CPL, and all conditions in the Water Way CPL for the reimbursement of losses by ATIF have been met.

186.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $1,150,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Water Way CPL and prosecuting this action.

## COUNT ELEVEN
### (Breach of Contract - Battersea Property Transaction)

187.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 71, 72, 79 through 84, 105, and 106 of its FAC as Paragraph 187 of this Count Eleven as though fully set forth herein.

188.    The Battersea CPL is a valid and binding contract between the FDIC-R and ATIF.

189.    The Battersea CPL requires ATIF to reimburse the FDIC-R for losses that result from Rudd's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Battersea Property Transaction.

190.    Rudd engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Battersea Property Transaction, and the FDIC-R has experienced significant losses as a result.

191.    ATIF has breached the Battersea CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd in connection with the Battersea Property Transaction.

192.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Battersea CPL.

193.    The FDIC-R and WaMu have performed all obligations required of them under the Battersea CPL, and all conditions in the Battersea CPL for the reimbursement of losses by ATIF have been met.

194.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $625,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Battersea CPL and prosecuting this action.

## COUNT TWELVE
### (Breach of Contract - Ari Way Property Transaction)

195.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 71, 72, 85 through 90, 105, and 106 of its FAC as Paragraph 195 of this Count Twelve as though fully set forth herein.

196.    The Ari Way CPL is a valid and binding contract between the FDIC-R and ATIF.

197.    The Ari Way CPL requires ATIF to reimburse the FDIC-R for losses that result from Rudd's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Ari Way Property Transaction.

198.    Rudd engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Ari Way Property Transaction, and the FDIC-R has experienced significant losses as a result.

199.    ATIF has breached the Ari Way CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd in connection with the Ari Way Property Transaction.

200.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Ari Way CPL.

201.    The FDIC-R and WaMu have performed all obligations required of them under the Ari Way CPL, and all conditions in the Ari Way CPL for the reimbursement of losses by ATIF have been met.

202.    As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $910,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Ari Way CPL and prosecuting this action.

## COUNT THIRTEEN
### (Breach of Contract - Bass Avenue Property Transaction)

203.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 91 through 97, 105, and 106 of its FAC as Paragraph 203 of this Count Thirteen as though fully set forth herein.

204.    The Bass Avenue CPL is a valid and binding contract between the FDIC-R and ATIF.

205.    The Bass Avenue CPL requires ATIF to reimburse the FDIC-R for losses that result from López's fraud, dishonesty, and failure to comply with WaMu's closing instructions in connection with the closing of the Bass Avenue Property Transaction.

206.    López engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of closing of the Bass Avenue Property Transaction, and the FDIC-R has experienced significant losses as a result.

207.    ATIF has breached the Bass Avenue CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by López in connection with closing of the Bass Avenue Property Transaction.

208.    The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Bass Avenue CPL.

209.     The FDIC-R and WaMu have performed all obligations required of them under the Bass Avenue CPL, and all conditions in the Bass Avenue CPL for the reimbursement of losses by ATIF have been met.

210.     As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $1,300,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Bass Avenue CPL and prosecuting this action.

## COUNT FOURTEEN
**(Breach of Contract - Alamanda Property Transaction)**

211.     The FDIC-R hereby incorporates Paragraphs 1 through 15, and 98 through 106 of its FAC as Paragraph 211 of this Count Fourteen as though fully set forth herein.

212.     The Alamanda CPL is a valid and binding contract between the FDIC-R and ATIF.

213.     The Alamanda CPL requires ATIF to reimburse the FDIC-R for losses that result from K&G's fraud, dishonesty, and failure to comply with WaMu's closing instructions of in connection with the closing of the Alamanda Property Transaction.

214.     K&G engaged in fraudulent and dishonest conduct and failed to comply with WaMu's closing instructions with respect to the closing of the Alamanda Property Transaction, and the FDIC-R has experienced significant losses as a result.

215.     ATIF has breached the Alamanda CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by K&G in connection with the Alamanda Property Transaction.

50

216.     The FDIC-R is the legally appointed receiver for WaMu and has the legal right to enforce the Alamanda CPL.

217.     The FDIC-R and WaMu have performed all obligations required of them under the Alamanda CPL, and all conditions in the Alamanda CPL for the reimbursement of losses by ATIF have been met.

218.     As a result of ATIF's breach of its contractual obligations, the FDIC-R has sustained an actual loss in an amount to be proved at trial but not less than $730,000, with appropriate interest thereon, and attorneys' fees and costs incurred in connection with enforcing the Alamanda CPL and prosecuting this action.

## COUNT FIFTEEN
### (Declaratory Relief – Melaeuca Property Transaction)

219.     The FDIC-R hereby incorporates Paragraphs 1 through 22, 105, and 106 of its FAC as Paragraph 219 of this Count Fifteen as though fully set forth herein.

220.     The FDIC-R contends that, pursuant to the terms of the Melaeuca CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rose in connection with closing the Melaeuca Property Transaction.

221.     The FDIC-R further contends that Rose in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

222.     To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rose; and (b) take a position as to whether it is accepting or

denying the FDIC-R coverage as to the Melaeuca CPL claim relating to the Melaeuca Property Transaction in a timely manner.

223.   There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Melaeuca CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Melaeuca CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Melaeuca CPL.

224.   The FDIC-R and WaMu have performed all obligations required of them under the Melaeuca CPL.

225.   All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

226.   The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

227.   The FDIC-R believes it is entitled to compensation under the provisions of the Melaeuca CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rose in connection with closing the Melaeuca Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Melaeuca CPL and the extent to which the Melaeuca CPL provides coverage for the Melaeuca Property Transaction described herein.

228.     Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

229.     Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Melaeuca CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rose; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Melaeuca CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Rose in connection with the Melaeuca Property Transaction described herein.

## COUNT SIXTEEN
### (Declaratory Relief – 1505 North Fort Lauderdale Property Transaction)

230.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 23 through 32, 105, and 106 of its FAC as Paragraph 230 of this Count Sixteen as though fully set forth herein.

231.     The FDIC-R contends that, pursuant to the terms of the 1505 North Fort Lauderdale CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by S&W in connection with closing the 1505 North Fort Lauderdale Property Transaction.

232.     The FDIC-R further contends that S&W in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

233. To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by S&W; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the 1505 North Fort Lauderdale CPL claim relating to the 1505 North Fort Lauderdale Property Transaction in a timely manner.

234. There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the 1505 North Fort Lauderdale CPL. There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the 1505 North Fort Lauderdale CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the 1505 North Fort Lauderdale CPL.

235. The FDIC-R and WaMu have performed all obligations required of them under the 1505 North Fort Lauderdale CPL.

236. All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

237. The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

238. The FDIC-R believes it is entitled to compensation under the provisions of the 1505 North Fort Lauderdale CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by S&W in connection with closing the 1505 North Fort

Lauderdale Property Transaction.  Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the 1505 North Fort Lauderdale CPL and the extent to which the 1505 North Fort Lauderdale CPL provides coverage for the 1505 North Fort Lauderdale Property Transaction described herein.

239.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

240.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the 1505 North Fort Lauderdale CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by S&W; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the 1505 North Fort Lauderdale CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by S&W in connection with the 1505 North Fort Lauderdale Property Transaction described herein.

**COUNT SEVENTEEN**
**(Declaratory Relief – 1501 North Fort Lauderdale Property Transaction)**

241.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 23 through 32, 105, and 106 of its FAC as Paragraph 241 of this Count Seventeen as though fully set forth herein.

242.    The FDIC-R contends that, pursuant to the terms of the 1501 North Fort Lauderdale CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply

with WaMu's closing instructions by S&W in connection with closing the 1501 North Fort Lauderdale Property Transaction.

243.    The FDIC-R further contends that S&W in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

244.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by S&W; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the 1501 North Fort Lauderdale CPL claim relating to the 1501 North Fort Lauderdale Property Transaction in a timely manner.

245.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the 1501 North Fort Lauderdale CPL. There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the 1501 North Fort Lauderdale CPL.   The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the 1501 North Fort Lauderdale CPL.

246.    The FDIC-R and WaMu have performed all obligations required of them under the 1501 North Fort Lauderdale CPL.

247.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

248.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

249.    The FDIC-R believes it is entitled to compensation under the provisions of the 1501 North Fort Lauderdale CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by S&W in connection with closing the 1501 North Fort Lauderdale Property Transaction.  Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the 1501 North Fort Lauderdale CPL and the extent to which the 1501 North Fort Lauderdale CPL provides coverage for the 1501 North Fort Lauderdale Property Transaction described herein.

250.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

251.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the 1501 North Fort Lauderdale CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by S&W; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the 1501 North Fort Lauderdale CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by S&W in connection with the 1501 North Fort Lauderdale Property Transaction described herein.

## COUNT EIGHTEEN
### (Declaratory Relief – Breakwater Property Transaction)

252.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 33 through 39, 105, and 106 of its FAC as Paragraph 252 of this Count Eighteen as though fully set forth herein.

253.    The FDIC-R contends that, pursuant to the terms of the Breakwater CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Ubieta in connection with closing the Breakwater Property Transaction.

254.    The FDIC-R further contends that Ubieta in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

255.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Ubieta; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Breakwater CPL claim relating to the Breakwater Property Transaction in a timely manner.

256.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Breakwater CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Breakwater CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Breakwater CPL.

257.    The FDIC-R and WaMu have performed all obligations required of them under the Breakwater CPL.

258.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

259.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

260.    The FDIC-R believes it is entitled to compensation under the provisions of the Breakwater CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Ubieta in connection with closing the Breakwater Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Breakwater CPL and the extent to which the Breakwater CPL provides coverage for the Breakwater Property Transaction described herein.

261.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

262.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Breakwater CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Ubieta; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Breakwater CPL for all of WaMu's actual losses arising out of the fraud

and dishonesty and failure to comply with WaMu's closing instructions by Ubieta in connection with the Breakwater Property Transaction described herein.

## COUNT NINETEEN
### (Declaratory Relief – Indiana Street Property Transaction)

263.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 40 through 46, 105, and 106 of its FAC as Paragraph 263 of this Count Nineteen as though fully set forth herein.

264.    The FDIC-R contends that, pursuant to the terms of the Indiana Street CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the Indiana Street Property Transaction.

265.    The FDIC-R further contends that Dosen in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

266.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Indiana Street CPL claim relating to the Indiana Street Property Transaction in a timely manner.

267.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Indiana Street CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Indiana Street CPL.  The

controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Indiana Street CPL.

268.    The FDIC-R and WaMu have performed all obligations required of them under the Indiana Street CPL.

269.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

270.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

271.    The FDIC-R believes it is entitled to compensation under the provisions of the Indiana Street CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the Indiana Street Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Indiana Street CPL and the extent to which the Indiana Street CPL provides coverage for the Indiana Street Property Transaction described herein.

272.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

273.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Indiana Street CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement

from ATIF under the Indiana Street CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Dosen in connection with the Indiana Street Property Transaction described herein.

**COUNT TWENTY**
**(Declaratory Relief – Alton Property Transaction)**

274.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 47 through 52, 105, and 106 of its FAC as Paragraph 274 of this Count Twenty as though fully set forth herein.

275.    The FDIC-R contends that, pursuant to the terms of the Alton CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the Alton Property Transaction.

276.    The FDIC-R further contends that Dosen in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

277.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Alton CPL claim relating to the Alton Property Transaction in a timely manner.

278.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Alton CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Alton CPL.  The controversy

between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Alton CPL.

279.    The FDIC-R and WaMu have performed all obligations required of them under the Alton CPL.

280.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

281.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

282.    The FDIC-R believes it is entitled to compensation under the provisions of the Alton CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the Alton Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Alton CPL and the extent to which the Alton CPL provides coverage for the Alton Property Transaction described herein.

283.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

284.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Alton CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement

from ATIF under the Alton CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Dosen in connection with the Alton Property Transaction described herein.

## COUNT TWENTY-ONE
### (Declaratory Relief - West Avenue Property Transaction)

285.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 53 through 58, 105, and 106 of its FAC as Paragraph 285 of this Count Twenty-One as though fully set forth herein.

286.    The FDIC-R contends that, pursuant to the terms of the West Avenue CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the West Avenue Property Transaction.

287.    The FDIC-R further contends that Dosen in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

288.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the West Avenue CPL claim relating to the West Avenue Property Transaction in a timely manner.

289.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the West Avenue CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is

obligated to reimburse the FDIC-R pursuant to the terms of the West Avenue CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the West Avenue CPL.

290.    The FDIC-R and WaMu have performed all obligations required of them under the West Avenue CPL.

291.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

292.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

293.    The FDIC-R believes it is entitled to compensation under the provisions of the West Avenue CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the West Avenue Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the West Avenue CPL and the extent to which the West Avenue CPL provides coverage for the West Avenue Property Transaction described herein.

294.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

295.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the West Avenue CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing

instructions by Dosen; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the West Avenue CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Dosen in connection with the West Avenue Property Transaction described herein.

**COUNT TWENTY-TWO**
**(Declaratory Relief – 188th Street Property Transaction)**

296.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 59 through 64, 105, and 106 of its FAC as Paragraph 296 of this Count Twenty-Two as though fully set forth herein.

297.     The FDIC-R contends that, pursuant to the terms of the 188th Street CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the 188th Street Property Transaction.

298.     The FDIC-R further contends that Dosen in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

299.     To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the 188th Street CPL claim relating to the 188th Street Property Transaction in a timely manner.

300.     There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the 188th Street CPL.  There is a current

and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the 188th Street CPL.   The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the 188th Street CPL.

301.   The FDIC-R and WaMu have performed all obligations required of them under the 188th Street CPL.

302.   All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

303.   The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

304.   The FDIC-R believes it is entitled to compensation under the provisions of the 188th Street CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the 188th Street Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the 188th Street CPL and the extent to which the 188th Street CPL provides coverage for the 188th Street Property Transaction described herein.

305.   Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

306.   Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the 188th Street CPL by failing to reimburse the FDIC-R for the losses

resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the 188th Street CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Dosen in connection with the 188th Street Property Transaction described herein.

### COUNT TWENTY-THREE
**(Declaratory Relief – 78th Lane Property Transaction)**

307.    The FDIC-R hereby incorporates Paragraphs 1 through 15, 40, 65 through 70, 105, and 106 of its FAC as Paragraph 307 of this Count Twenty-Three as though fully set forth herein.

308.    The FDIC-R contends that, pursuant to the terms of the 78th Lane CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the 78th Lane Property Transaction.

309.    The FDIC-R further contends that Dosen in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

310.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the 78th Lane CPL claim relating to the 78th Lane Property Transaction in a timely manner.

311.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the 78th Lane CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the 78th Lane CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the 78th Lane CPL.

312.    The FDIC-R and WaMu have performed all obligations required of them under the 78th Lane CPL.

313.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

314.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

315.    The FDIC-R believes it is entitled to compensation under the provisions of the 78th Lane CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Dosen in connection with closing the 78th Lane Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the 78th Lane CPL and the extent to which the 78th Lane CPL provides coverage for the 78th Lane Property Transaction described herein.

316.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

317. Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the 78th Lane CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Dosen; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the 78th Lane CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Dosen in connection with the 78th Lane Property Transaction described herein.

## COUNT TWENTY-FOUR
### (Declaratory Relief – Water Way Property Transaction)

318. The FDIC-R hereby incorporates Paragraphs 1 through 15, 71 through 78, 105, and 106 of its FAC as Paragraph 318 of this Count Twenty-Four as though fully set forth herein.

319. The FDIC-R contends that, pursuant to the terms of the Water Way CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rudd in connection with closing the Water Way Property Transaction.

320. The FDIC-R further contends that Rudd in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

321. To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Water Way CPL claim relating to the Water Way Property Transaction in a timely manner.

70

322.     There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Water Way CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Water Way CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Water Way CPL.

323.     The FDIC-R and WaMu have performed all obligations required of them under the Water Way CPL.

324.     All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

325.     The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

326.     The FDIC-R believes it is entitled to compensation under the provisions of the Water Way CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rudd in connection with closing the Water Way Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Water Way CPL and the extent to which the Water Way CPL provides coverage for the Water Way Property Transaction described herein.

327.     Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

328.   Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Water Way CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Water Way CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Rudd in connection with the Water Way Property Transaction described herein.

## COUNT TWENTY-FIVE
### (Declaratory Relief – Battersea Property Transaction)

329.   The FDIC-R hereby incorporates Paragraphs 1 through 15, 71, 72, 79 through 84, 105, and 106 of its FAC as Paragraph 329 of this Count Twenty-Five as though fully set forth herein.

330.   The FDIC-R contends that, pursuant to the terms of the Battersea CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rudd in connection with closing the Battersea Property Transaction.

331.   The FDIC-R further contends that Rudd in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

332.   To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd; and (b) take a position as to whether it is accepting or

denying the FDIC-R coverage as to the Battersea CPL claim relating to the Battersea Property Transaction in a timely manner.

333.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Battersea CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Battersea CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Battersea CPL.

334.    The FDIC-R and WaMu have performed all obligations required of them under the Battersea CPL.

335.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

336.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

337.    The FDIC-R believes it is entitled to compensation under the provisions of the Battersea CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rudd in connection with closing the Battersea Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Battersea CPL and the extent to which the Battersea CPL provides coverage for the Battersea Property Transaction described herein.

338.     Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

339.     Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Battersea CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Battersea CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Rudd in connection with the Battersea Property Transaction described herein.

**COUNT TWENTY-SIX**
**(Declaratory Relief – Ari Way Property Transaction)**

340.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 71, 72, 85 through 90, 105, and 106 of its FAC as Paragraph 340 of this Count Twenty-Six as though fully set forth herein.

341.     The FDIC-R contends that, pursuant to the terms of the Ari Way CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rudd in connection with closing the Ari Way Property Transaction.

342.     The FDIC-R further contends that Rudd in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

343.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu' closing instructions by Rudd; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Ari Way CPL claim relating to the Ari Way Property Transaction in a timely manner.

344.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Ari Way CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Ari Way CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Ari Way CPL.

345.    The FDIC-R and WaMu have performed all obligations required of them under the Ari Way CPL.

346.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

347.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

348.    The FDIC-R believes it is entitled to compensation under the provisions of the Ari Way CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by Rudd in connection with closing the Ari Way Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the

parties under the Ari Way CPL and the extent to which the Ari Way CPL provides coverage for the Ari Way Property Transaction described herein.

349.     Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

350.     Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Ari Way CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by Rudd; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Ari Way CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by Rudd in connection with the Ari Way Property Transaction described herein.

## COUNT TWENTY-SEVEN
### (Declaratory Relief – Bass Avenue Property Transaction)

351.     The FDIC-R hereby incorporates Paragraphs 1 through 15, 91 through 97, 105, and 106 of its FAC as Paragraph 351 of this Count Twenty-Seven as though fully set forth herein.

352.     The FDIC-R contends that, pursuant to the terms of the Bass Avenue CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by López in connection with closing the Bass Avenue Property Transaction.

353.   The FDIC-R further contends that López in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

354.   To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by López; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Bass Avenue CPL claim relating to the Bass Avenue Property Transaction in a timely manner.

355.   There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Bass Avenue CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Bass Avenue CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Bass Avenue CPL.

356.   The FDIC-R and WaMu have performed all obligations required of them under the Bass Avenue CPL.

357.   All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

358.   The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

359.   The FDIC-R believes it is entitled to compensation under the provisions of the Bass Avenue CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent

or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by López in connection with closing the Bass Avenue Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Bass Avenue CPL and the extent to which the Bass Avenue CPL provides coverage for the Bass Avenue Property Transaction described herein.

360.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

361.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Bass Avenue CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by López; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Bass Avenue CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by López in connection with the Bass Avenue Property Transaction described herein.

## COUNT TWENTY-EIGHT
### (Declaratory Relief – Alamanda Property Transaction)

362.    The FDIC-R hereby incorporates Paragraphs 1 through 15, and 98 through 106 of its FAC as Paragraph 362 of this Count Twenty-Eight as though fully set forth herein.

363.    The FDIC-R contends that, pursuant to the terms of the Alamanda CPL, ATIF has committed to reimburse WaMu for any "actual loss" arising out of the fraudulent or dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by K&G in connection with closing the Alamanda Property Transaction.

364.    The FDIC-R further contends that K&G in fact fraudulently and dishonestly handled documents, misappropriated WaMu's funds, and disbursed those funds contrary to WaMu's instructions.

365.    To date, ATIF has failed to: (a) reimburse the FDIC-R for any of the actual losses suffered by the FDIC-R due to the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by K&G; and (b) take a position as to whether it is accepting or denying the FDIC-R coverage as to the Alamanda CPL claim relating to the Alamanda Property Transaction in a timely manner.

366.    There is a bona fide, actual, present practical need for a declaration as to the FDIC-R's rights to coverage and reimbursement under the Alamanda CPL.  There is a current and actual controversy and dispute between the FDIC-R and ATIF over whether or not ATIF is obligated to reimburse the FDIC-R pursuant to the terms of the Alamanda CPL.  The controversy between the FDIC-R and ATIF is real and substantial, touching upon the legal relations of the parties under the Alamanda CPL.

367.    The FDIC-R and WaMu have performed all obligations required of them under the Alamanda CPL.

368.    All of the antagonistic and adverse interests relating to the controversy between the FDIC-R and ATIF are before this court.

369.    The relief sought by the FDIC-R is not merely the giving of legal advice or the answer to questions propounded by curiosity.

370.    The FDIC-R believes it is entitled to compensation under the provisions of the Alamanda CPL requiring the reimbursement of any "actual loss" arising out of the fraudulent or

dishonest handling of WaMu's funds or documents or the failure to comply with WaMu's closing instructions by K&G in connection with closing the Alamanda Property Transaction. Accordingly, the FDIC-R seeks a ruling from this Court as to the rights and obligations of the parties under the Alamanda CPL and the extent to which the Alamanda CPL provides coverage for the Alamanda Property Transaction described herein.

371.    Because of the current, actual controversy between the FDIC-R and ATIF, the FDIC-R has suffered and will continue to suffer damage and injury, namely the millions of dollars of past and continuing losses to the FDIC-R.

372.    Accordingly, the FDIC-R requests that this Court enter a judgment declaring that: (a) ATIF has breached the Alamanda CPL by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by K&G; and (b) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the Alamanda CPL for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by K&G in connection with the Alamanda Property Transaction described herein.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff FDIC-R demands the following relief:

A.    an award of damages for all amounts recoverable resulting from Defendant ATIF's breaches of the fourteen CPLs discussed herein and attached hereto as Exhibits A-N;

B.    an award of pre-judgment interest on the damages resulting from Defendant ATIF's breaches of the fourteen CPLs discussed herein and attached hereto as Exhibits A-N, including but not limited to: (1) interest incurred from the date of the closings of the fourteen

Transactions to the date of the filing of the original Complaint in this action (the "Filing Date"); and (2) interest incurred from the Filing Date to the date that judgment is entered in this case;

C.      the entry of a judgment declaring that: (1) ATIF has breached the fourteen CPLs discussed herein and attached hereto as Exhibits A-N by failing to reimburse the FDIC-R for the losses resulting from the fraudulent and dishonest conduct and failure to comply with WaMu's closing instructions by ATIF's Agents; and (2) as receiver for WaMu, the FDIC-R is entitled to reimbursement from ATIF under the fourteen CPLs discussed herein and attached hereto as Exhibits A-N for all of WaMu's actual losses arising out of the fraud and dishonesty and failure to comply with WaMu's closing instructions by ATIF's Agents in connection with the fourteen Transactions described herein; and

D.      all other relief that the Court determines is both reasonable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff FDIC-R hereby demands a trial by jury on all issues so triable.

Dated: February 22, 2013

By  /s/ Steven Jay Katzman /s/

Of counsel:                          Steven Jay Katzman (Trial Counsel)
Aaron M. Forester                    Email: skatzman@bmkattorneys.com
Email: aforester@FDIC.gov            BIENERT, MILLER & KATZMAN PLC
FDIC Legal Division                  903 Calle Amanecer, Suite 350
3501 Fairfax Drive. VS-B-7066        San Clemente, CA 92673
Arlington, VA 22226                  Tel:  949-369-3700
Tel.: 703-516-5056                   Fax:  949-369-3701

Onier Llopiz (FBN 579475)
Email: ol@lydeckerdiaz.com
LYDECKER DIAZ
1221 Brickell Avenue, 19th Floor
Miami, FL 33131
Tel.: (305) 416-3180

Counsel for the Federal Deposit Insurance
Corporation as Receiver for Washington
Mutual Bank, FSB

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using CM/ECF on February 22, 2013, I also certify that a true and correct copy of the foregoing was served this day via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

By */s/ Onier Llopiz*_____
Onier Llopiz (FBN 579475)

## SERVICE LIST

Aaron Christopher Wong
Email: acw@cohenruiz.com
Cynthia Morales
Email: cm@cohenruiz.com
COHEN RUIZ P.A.
201 S Biscayne Blvd., Suite 850
Miami, FL 33131-2310
Tel.: 305-702-3000
Fax: 305-702-3030
*Attorney for Defendant*