## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 12-23599-CIV-SEITZ/SIMONTON

FDIC, AS RECEIVER FOR WASHINGTON
MUTUAL BANK,

      Plaintiff,

v.

ATTORNEYS' TITLE INSURANCE FUND,
INC.,

      Defendant.

_____/

## OMNIBUS ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [DE 64, DE 68]

THIS CAUSE came before the Court on the parties' cross-motions for summary judgment. [DE 64, DE 68]. In this action, the FDIC, as receiver for Washington Mutual Bank ("WaMu"), seeks reimbursement from Attorney's Title Insurance Fund ("ATIF") for WaMu's losses on 14 defaulted residential mortgages. ATIF's agents and authorized attorneys served as closing agent for each of the transactions. The FDIC now asserts that the agent's malfeasance caused WaMu to lend money to unqualified borrowers under false pretenses, and ultimately, causing a loss of more than nine million dollars when the borrowers defaulted and the loans were written down and sold.

WaMu and ATIF had a separate indemnity agreement for each closing where ATIF agreed to reimburse WaMu for losses arising out of its closing agent's (a) fraud or dishonesty in handling the bank's funds or closing documents or (b) the agent's failure to follow the bank's closing instructions. These agreements are known in the real estate industry as Closing Protection Letters ("CPL"). As WaMu's receiver after its collapse, the FDIC made claims on each of the CPLs. When ATIF refused to honor them, this action followed.

The cross-motions present the following five discrete issues for resolution: (1) whether the FDIC has standing to seek indemnification under the CPLs; (2) whether WaMu's alleged

contributory negligence precludes recovery; (3) whether the FDIC's untimely notice precludes recovery under the CPLs; (4) whether ATIF is liable for breach of contract; and (5) the amount of damages, if any, the FDIC is entitled to recover.   Upon consideration of the cross-motions, oppositions [DE 78, DE 82], replies [DE 91, DE 92], and the voluminous record, summary judgment must be granted in part for each party.   The Court finds as follows: (1) the FDIC has standing to pursue the CPL claims; (2) contributory negligence is not a bar to recovery; (3) eight of the fourteen transactions are not covered under the CPLs because the FDIC failed to make a timely claim; (4) and (5) the FDIC is entitled to summary judgment on the remaining six transactions in the amount of $4,901,973.54 in damages.   As such, there are no issues to be resolved at trial.   Each finding is discussed in turn, but first, the dispute's background is set forth in greater detail.

## I.      FACTUAL BACKGROUND AND STANDARD

### a.  *Background*

Title insurance companies, like ATIF, utilize networks of authorized attorneys and agents to issue title insurance policies in real estate transactions.   Title insurers' agents also commonly act as closing agents in those transactions where the company they represent is underwriting the title insurance.   When a title insurer's agent is performing the closing, mortgage lenders often require that the title insurer indemnify the lender for losses that arise out of the agent's misconduct or failure to follow closing instructions.   John C. Murray, *Closing Protection Letters: What Is (and Is Not) Covered?*, 561 PLI/Real 193 (New York: 2008).   A closing agent's role is to supervise the final transaction between the buyer and seller by overseeing the transfer of money and property and the ensuring the transaction documents are finalized.

One such document is a form known as a "HUD-1."   A HUD-1 is the uniform settlement statement mandated by the Real Estate Settlement Procedures Act in all transactions involving loans by federally insured banks.   12 U.S.C. § 2601 *et seq*.   HUD-1s are prepared in conjunction with the closing and document the transaction's payments and costs.   The HUD-1 is "probably the most

important document in the closing package . . . [because] . . . [b]uyers, sellers, borrowers, lenders, and secondary market participants all rely on the accuracy of HUD-1s in making decisions." *United States v. Wilkins*, 2007 WL 896147, at *8 (E.D. Tenn., March 22, 2007).

Plaintiff's twenty-eight-count complaint alleges that in fourteen South Florida residential transactions that closed between 2005 and 2007[1] ATIF's agents fraudulently or dishonestly documented the HUD-1s, closed transactions to unqualified borrowers in violation of WaMu's closing instructions, and caused WaMu's funds to be transferred without disclosing to the bank to whom the funds were transferred. The borrower in each of the 14 transactions defaulted, often just a few payments into the mortgage.

WaMu collapsed in 2008 in the biggest bank failure in American history. In September 2008, the Office of Thrift Supervision ("OTS") took over the bank. OTS appointed the FDIC as WaMu's receiver and the FDIC immediately sold a large portion of WaMu's assets, including its mortgage loan portfolio, to JPMorgan Chase ("Chase"). The sales agreement between Chase and the FDIC is known as the Purchase and Assumption Agreement ("P&A Agreement"). As discussed in Section II, the CPL indemnity rights were "carved-out" of the sale to enable the FDIC to prosecute WaMu's claims against third parties that defrauded the bank. Using its administrative subpoena power, the FDIC embarked on a large-scale investigation into 500 defaulted loan files it suspected might be attributable to closing agent malfeasance. The fourteen transactions at issue here were a part of that investigation.

---

[1] In the order listed in the Complaint, the transactions are as follows: (1) 625 Melaleuca Lane ("Melaleuca"), (2) 1505 North Fort Lauderdale Beach Boulevard ("1505 Fort Lauderdale"), (3) 1501 North Fort Lauderdale Beach Boulevard ("1501 Fort Lauderdale"), (4) 1106 Breakwater Court ("Breakwater"), (5) 3022 Indiana Street ("Indiana"), (6) 400 Alton Road, #411 ("Alton"), (7) 1200 West Avenue, #1102 ("West Ave."), (8) 3029 NE 188 Street, #422 ("188 Street"), (9) 11145 NW 78th Lane ("78th Lane"), (10) 213 Water Way ("Water Way"), (11) 3615 Battersea Road ("Battersea"), (12) 211 Ari Way ("Ari Way"), (13) 76 Bass Avenue ("Bass Ave."), and (14) 2190 Alamanda Drive ("Alamanda"). As to each transaction, the Complaint alleges one breach of contract count seeking damages and one declaratory judgment count seeking a declaration that ATIF has breached the CPL and that the FDIC is entitled to damages.

### b. *Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## II.   THE FDIC HAS STANDING TO PURSUE ITS CPL CLAIMS

The parties have cross-moved for summary judgment on ATIF's First Affirmative Defense that the FDIC lacks standing to assert any claims under the CPLs because WaMu sold the loans to Chase in 2008. ATIF makes two arguments – first, that CPL rights may only be claimed by the current owner of the land interest, and second, that even if the CPL rights do not "run with the land," the FDIC did not carve those rights out from the 2008 P&A with Chase. Though the law in this area

is unsettled, a plain reading of the CPLs and the P&A agreement requires a finding that the FDIC has standing to sue under the CPLs.

        *i.*      *CPLs Do Not "Run With The Land" and are Severable From Title Insurance*

All 14 CPLs use the same state-mandated form preamble language:

> When title insurance of Attorneys' Title Insurance Fund is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the Attorneys' Title Insurance Fund, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closing when conducted by said Issuing Agent or Approved Attorney when such loss arises out of . . . [agent failure to comply with closing instructions or fraud] . . .

The question of standing turns, in part, on the proper interpretation of the phrase "in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land." Courts within the District are split on that issue. In *FDIC v. Floridian Title Group, Inc.*, 12-21890-cv, 2013 WL 5346435 (S.D. Fla. Sept. 23, 2013), the court found that language limits the CPLs protections to *current* possessors of land. However, in *FDIC v. Property Transfer Services*, 12-80533-cv, 2013 WL 5535561 (S.D. Fla. Oct. 7, 2013) ("*PTS*"), the court rejected this construction as inserting a limitation where the language of the CPL does not require doing so. Rather, the *PTS* court read the phrase "in which you are to be the lessee or purchaser in the land or a lender secured by a mortgage . . ." to describe who receives indemnification protection. The soundness of that reading is confirmed by the absence of other language in the CPLs that divests a lender of indemnity rights when it sells the mortgage. *See JPMorgan Chase Bank v. First Am. Title Ins. Co.*, 795 F. Supp 624, 631 (E.D. Mich. 2013). As such, based upon the language of the contract, the *PTS* court's interpretation better reflects the parties' intent.

    Next, ATIF contends that the CPLs necessarily run with the land because they are not severable from title insurance and are simply ancillary to it. ATIF buttresses its position by

suggesting CPLs are unsupported by independent consideration and by highlighting that the terms of the CPL expressly limit the liability covered as "coextensive" with the title insurance policy. While it is correct that lenders do not pay a separate premium for CPL coverage, CPLs are nonetheless supported by independent consideration. *JPMorgan Chase Bank v. First Am. Title. Ins. Co.*, 750 F.3d 573, 579 (6th Cir. 2014). CPLs are an inducement by a title insurer to the lender to buy its title insurance. *Id.* Lenders buy a title insurance policy, in part, because title insurers agree to provide them with closing services. The CPL is an indemnity agreement that a title insurer uses to quell a lender's understandable fear of entrusting an unknown agent with large sums of money and important legal documents. James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORT TRIAL & INS. PRACT. L.J. 3, 845 (2001). Therefore, the purchase of the title insurance forms the basis of consideration for the CPL contract.

Though CPL liability is "coextensive" with the title insurance policy, CPLs and title insurance protect a lender against different risks. CPLs safeguard a lender from losses arising from a closing agent's fraud or dishonesty or failure to follow instructions, while title insurance safeguards against defects in title. The fact that the title insurer limits its liability under the CPL to the amount of the underlying insurance policy does not make the documents inseparable. In fact, each of the fourteen CPLs at issue state that "[the CPL] shall not affect the protection afforded by a title insurance binder, commitment or policy of (insert title insurer)." Thus, it is clear that the CPL and title insurance policy are distinct.

    ii.    *The FDIC "Carved Out" Its Rights Under the CPLs From the Sale of the WaMu Loans to Chase*

ATIF's second argument the FDIC lacks standing is based upon *its* review of the P&A Agreement between the FDIC and Chase. Based on *its* interpretation, ATIF asserts that the FDIC sold its CPL-based indemnity rights to Chase in 2008. However, ATIF lacks essential prudential standing as an intended third-party beneficiary of the P&A Agreement and thus, is foreclosed from

making that argument. *See Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 934 (11th Cir. 2013) (finding that third party to the WaMu P&A Agreement between the FDIC and Chase lacks standing to enforce its construction of the agreement).[2]

### III.   THE FDIC IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S THIRD AFFIRMATIVE DEFENSE ("WAMU AT FAULT")

In its third affirmative defense, ATIF asserts that the alleged fact of WaMu's negligent underwriting frees ATIF of its indemnity obligations because Florida law disfavors a party indemnifying itself against its own negligence absent unequivocal terms of intent. *See Charles Poe Masonry Inc. v. Spring Lock Scaffolding Rental Equip. Co.*, 374 So.2d 487, 489 (Fla. 1979), However, summary judgment must be granted for Plaintiff on this defense because Defendant has not established that fault of the indemnitee is a defense *in a CPL-based* indemnity action.

In fact, to the contrary, the court in *FDIC v. Attorneys' Title Ins. Fund, Inc*, 10-21197-PCH, slip op. at 6 (S.D. Fla. May 17, 2011) ("*Indymac*") has already rejected that argument. The *Indymac* court  found that CPLs are "sufficiently different" from standard indemnity contracts such that they are an exception to Florida's general prohibition on indemnification in cases of negligence.

---

[2] Even if the argument could be presented, it would fail. *See PTS*, 2013 WL 5535561 at *6-7.  Section 3.5 of the P&A Agreement, which concerns the reservation of assets, states in pertinent part:

[JPMorgan Chase] does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement ...

> (b) any interest, right, action, claim, or judgment against . . . (i) . . . [any] Person . . . retained by the Failed Bank . . . arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, . . . or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, *regardless of when any such claim is discovered and regardless of whether any such claim is made* with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing.

The *PTS* court correctly found that section 3.5(b)(i) does not exempt CPL claims from the FDIC's reservation of rights, that section 3.5(b)(ii) does not limit suits only for recovery under insurance policies, and that section 3.5(b)(iv) applies to CPL claims because the events establishing the losses occurred before the predecessor bank's failure.

Moreover, as is discussed at length in Section V, CPLs are unique because they are indemnity agreements which operate under the backdrop of a fiduciary relationship between the agent and lender.

Though ATIF has not cited any decision where a court has found that Florida's indemnity rule applies to CPLs, ATIF suggests that the *Indymac* court would have reached a different result had it considered the Eleventh Circuit's ruling in *Gibbs v. Air Canada*, 810 F.2d 1529 (11th Cir. 1987).[3] However, *Gibbs*, another non-CPL case, simply reiterates the general rule announced in *Charles Poe Masonry* and does not compel a different outcome in *Indymac*. In *Gibbs*, the Eleventh Circuit found that, in the absence of contrary intent, any fault of the indemnitee that is a legal cause of its own loss will negate the contractual indemnitor's obligation. However, as Plaintiff points out in its opposition, the indemnity provision in *Gibbs* is categorically different than the indemnity language of the CPL. There, Aircraft Services, Inc. agreed to indemnify Air Canada for damages *caused by* the negligence or willful misconduct of Aircraft Services' employees. As yet more evidence of their uniqueness, CPLs merely require that the loss "arise out of" the agent's misconduct, which in Florida is only a "causal connection" but not proximate cause. *Taurus Holdings Inc. v. U.S. Fidelity and Guar. Co.*, 913 So.2d 528, 539-40 (Fla. 2005). Most importantly, ATIF has neglected to consider the actual language of the CPL and, without further authority, it cannot rely on its overextension of *Gibbs* to make new law to warrant summary judgment on its contributory negligence defense.

## IV. ATIF IS ENTITLED TO SUMMARY JUDGMENT ON EIGHT OF THE FOURTEEN TRANSACTIONS ON NOTICE GROUNDS[4]

ATIF has moved for summary judgment on 11 of the 14 transactions on grounds that the

---

[3] ATIF's citation to Judge Altonaga's pre-trial order in *Regions Bank v. Attorneys' Title Insurance Fund, Inc.*, 13-20575, is unpersuasive. Judge Altonaga did deny Plaintiff's motion *in limine* to preclude Defendant from offering evidence regarding Plaintiff's loan underwriting, but the record contains no explanation for why she issued that ruling.

[4] For purposes of the discussion on the application of untimely notice defense, the Court assumes that the eight CPLs at issue are valid contracts. ATIF did not move for summary judgment on notice grounds as to the Battersea, Ari Way, or Bass Avenue transactions.

FDIC did not timely notify the ATIF of WaMu's claims under the CPL.  Timely notice is a condition precedent to ATIF's indemnity obligation.  Paragraph 4D of the form CPL provides:

> Claims of loss shall be made promptly to the (insert title insurer) at its principal office at (address). When the failure to give prompt notice shall prejudice the (insert title insurer), then liability of the (insert title insurer) hereunder shall be reduced to the extent of such prejudice. The (insert title insurer) shall not be liable hereunder unless notice of loss in writing is received by the (insert title insurer) within ninety (90) days from the date of discovery of such loss.

The phrase "the date of discovery of such loss" includes not only the date of discovery of actual loss, but also when the indemnitee has knowledge of specific acts giving rise to a claim covered by the CPL.  *PTS*, 2013 WL 5535561, at *8.  As is set forth in greater detail in Section V, a lender is entitled to indemnification if the closing agent (1) failed to comply with instructions relating to enforceability of the mortgage lein, the requirement to obtain documents, or the requirement to disburse funds properly, or (2) committed fraud or acted dishonestly in handling WaMu's funds or closing documents.

Thus, if WaMu or the FDIC failed to give notice to ATIF that it sought indemnification under the CPL within 90 days of learning either of an agent's failure to follow closing instructions or of an agent's fraudulent or dishonest conduct such that ATIF's indemnification obligation would be triggered, ATIF is not liable.  The 90-day notice requirement is a "bright line," meaning that prejudice is irrelevant outside of the 90-day notice period.  *Id.*  The undisputed record evidence shows that for eight of the fourteen transactions, WaMu or the FDIC knew more than 90 days before making its CPL claim either of: (a) an undisclosed second mortgage at closing, meaning the agent did not follow closing instructions, or (b) knew facts that the loss arose out of an agent's fraud or dishonesty.  Thus, summary judgment must be granted on the 1501 Fort Lauderdale, 1505 Fort Lauderdale, Alamanda, Breakwater, Indiana Street, Alton Road, West Avenue, and 188th Street transactions, each of which is discussed below.  Summary judgment must be denied as to three – Melaleuca, Water Way, and 78th Lane.

a.   *The Eight Properties For Which Summary Judgment is Granted*

(1) <u>1501 Fort Lauderdale</u>; (2) <u>1505 Fort Lauderdale</u>

The FDIC made its claim to ATIF on these CPLs in May 2011.  However, the record evidence shows that WaMu had notice of specific facts giving rise to indemnity under the Fort Lauderdale CPLs in late 2007.  In December 2007, WaMu's counsel wrote a letter to ATIF notifying ATIF that it had a duty to defend WaMu's interests in the foreclosure of the 1501 property, following the borrowers default.  [DE 65-2, p. 9].   WaMu's counsel alleged that ATIF's closing agent's fraud triggered ATIF's duty to defend under the title insurance policy.  *Id.*  The record evidence reflects that WaMu's counsel had become aware of the fraud in October 2007, when an attorney for the seller notified WaMu's counsel about fraud in both the 1501 and 1505 transactions. *Id.* at p. 11.  Thus, the uncontroverted record evidence shows that in 2007, WaMu had sufficiently particularized knowledge about closing agent fraud to make a claim under the title insurance policy in connection with the 1501 foreclosure.  As such, WaMu knew or should have known that, based on these same facts, it also had an indemnification claim on the CPLs.  That knowledge notwithstanding, the FDIC did not make a claim on the CPLs until over three years later.  As such, ATIF warrants summary judgment on Counts Two, Three, Sixteen and Seventeen.

(3) <u>Alamanda</u>

The FDIC made its claim on the Alamanda CPL in July 2011.  WaMu foreclosed on Alamanda borrowers in July 2008.  The notice of *lis pendens* issued with the foreclosure complaint named the Alamanda property seller, Ana Novo, as a subordinate lien holder.[5] [DE 65-9; DE 67-214].  The fact that the *seller* retained an interest in the property is evidence that the seller financed the transaction at closing.  As is set forth in greater detail in Section V *infra*, WaMu's standard closing instruction to the closing agents was that no outside source of financing, including second

---

[5] A notice of *lis pendens* is "a notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all person that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome." *Black's Law Dictionary* 1073 (10th ed. 2014).

mortgages, was allowed without express written approval.  This standard condition also applied to the Alamanda transaction. [DE 71-49].    Therefore, WaMu knew as of July 2008 when it filed to foreclose on the property that ATIF's agent Kramer & Golden P.A. failed to follow WaMu's closing instructions prohibiting closing the sale if the buyer had any secondary financing.  Nonetheless, the FDIC did not make a CPL claim until three years later.

The FDIC does not contest that the seller Ana Novo financed the sale or that Kramer & Golden failed to follow closing instructions.  Rather, the FDIC's argument in response is that the *lis pendens* is irrelevant because it does not give the details of the disposition of the second mortgage funds or disclose whether the closing agent participated in closing the second mortgage.  That argument is unavailing however because CPL liability for an agent's violation of the closing instructions does not require proof of the agent's knowledge or intent, it only requires a showing that it was clear on the date the *lis pendens* was filed that there were facts showing the closing instructions were violated.    As such, summary judgment is warranted for Defendant on Counts Fourteen and Twenty Eight.

(4) <u>Breakwater</u>

The FDIC made a claim on the Breakwater CPL in August 2011.  ATIF asserts, and WaMu does not deny, that as a part of closing package WaMu received a document entitled "Evidence of Personal Property Insurance."  [DE 65 ¶ 32; DE 77 ¶ 32].  The document, dated October 12, 2006, lists National City Bank as a second mortgagee of the Breakwater property.  [DE 65-10, p. 34].  Raphael Ubita, ATIF's agent, executed the HUD-1 settlement statement on October 19, 2006.  [DE 67-73].  As such, it is apparent that WaMu knew or should have known that there was a second mortgage on the property at the time of closing and, that by closing such a transaction, Ubieta violated the closing instructions.  As with the Alamanda transaction, the FDIC's objection that the Personal Property Insurance document is irrelevant is a meritless effort to import a scienter element into the failure to follow a closing instructions provision.  Because the FDIC did not make

its CPL claim until almost five years after WaMu knew of facts that would give rise to a claim, summary judgment is warranted for Defendants on Counts Four and Eighteen.

(5) <u>Indiana Street</u>; (6) <u>Alton Road</u>; (7) <u>West Avenue</u>; (8) <u>188th Street</u>

The FDIC received HUD-1 Settlements for each of the above transactions pursuant to an administrative subpoena in October 2011. Though each HUD-1 showed unauthorized subordinate financing and thus clearly indicated that the transactions were closed in contravention of WaMu's closing instructions, the FDIC did not provide ATIF written notice until February 2012, one month outside of the 90-day window. The FDIC's failure to meet the CPLs 90-day notice condition precedent requires summary judgment for ATIF on Counts Five and Nineteen (Indiana), Counts Six and Twenty (Alton), Counts Seven and Twenty-One (West), and counts Eight and Twenty-Two (188th Street).[6]

The FDIC makes two arguments why its failure to meet the notice condition precedent should be excused. First, it argues that its untimeliness was because of the volume of WaMu loan files that had to be reviewed, and its giving notice in February as opposed to January was objectively reasonable under the circumstances. While it may be true that a backlog in reviewing loan files caused the FDIC's delay, Plaintiff has not cited any authority that would allow a judicial rewrite of a CPL contract to allow a stale CPL claim on the basis of an administrative backlog. The cases to which Plaintiff does cite, *Bease v. Main Street Investments*, 220 F. Supp. 3d 1338, 1345-1347 (M.D. Fla. 2002) and *Russell Gasket Co. v. Phoenix of Harford, Insurance. Co.*, 512 F.2d 205, 208 (6th Cir. 1975), do not compel such a result either. *Bease* is inapposite because it involves excuse of a statute of limitations, not a bargained-for contract. Likewise, *Russell Gasket Co.* is inapplicable because it involves insurance and not indemnity.

---

[6] Additionally, in the foreclosure Complaint for the 188th Street property which WaMu filed on June 24, 2008, it specifically plead that Countrywide Bank had an unrecorded second mortgage in the amount of $200,000.00 as of June 5, 2007, the date of the closing. [DE 65-10, p. 31]. As such, WaMu knew the borrower had an unauthorized second mortgage at closing in June 2008. This fact would alternatively justify the entry of summary judgment for ATIF on the 188th Street CPL.

As its second argument the FDIC asserts that notwithstanding its untimely notice, the record evidence makes clear that ATIF knew about the facts giving rise to CPL claims well before February 2012 because it had investigated Ryan Dosen, the agent that closed all four transactions.  Though ATIF did investigate Dosen, the FDIC has not produced any record evidence that shows that ATIF had particularized knowledge of Dosen's fraud in these transactions such that it would give rise to ATIF's indemnity obligation or that if ATIF knew about a prospective claim, it was in a position to know the amount of the loss such that it could reimburse WaMu for the loss.  Knowledge of both facts are critical to satisfy the CPL notice requirement under Florida law.  *See PTS*, 2013 WL 5535561, at *8.

       b.      *Summary Judgment for ATIF is Denied on the Melaleuca, Water Way, and 78th Lane Transactions*

In each of these transactions, ATIF has provided a notice of *lis pendens* as evidence that WaMu knew that there were second mortgages on the properties.  However, ATIF's liability under the CPLs does not arise from the mere fact of a second mortgage but the timing of the second mortgage; the mortgage had to be in existence at the time of closing.  ATIF has not provided any record evidence to establish such fact, nor that shows WaMu knew that the closing agents failed to follow instructions by closing transactions financed by second mortgages.  As such, summary judgment cannot be granted as to these properties on notice grounds.[7]

---

[7] With respect to the Water Way transaction, ATIF also claims that WaMu's loan-servicing notes show the bank was aware of possible fraud.  The note from December 4, 2007 states "[The buyer said] that this is a fraud[…] He gave them his power of attorney, said that he is working with the FBI Christina Shepard." [DE 65-7, p. 10].  However, this vague statement is not evidence of broker Aubrey Rudd's misconduct in the closing such that it would give rise to WaMu's knowledge of a CPL claim.

## V.   FDIC IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY FOR BREACH OF CONTRACT FOR THE MELALUECA, WATER WAY, BATTERSEA, ARI WAY, 78TH LANE, AND BASS AVENUE TRANSACTIONS

As to all of the six remaining transactions, there is no genuine dispute in the record evidence that ATIF breached its indemnity obligation under the CPLs and that Plaintiff is entitled to recover WaMu's losses.[8]  As such, Plaintiff is entitled to summary judgment as to all six transactions on both the breach of contract and declaratory judgment counts.  The amount of damages is discussed in the next section.  In the foregoing discussion, each of the transactions is discussed individually, but first, it is necessary to provide an overview of how breach of contract is established as it relates to CPLs. Generally, the elements of a breach of contract action are: (1) the existence of a contract; (2) a breach of the contract; and (3) damages resulting from the breach.  *Grove Isle Ass'n, Inc. v. Grove Isle Assoc's, LLLP*, 137 So.3d 1081, 1094-95 (Fla. 3d DCA 2014).

  *i.*     *Existence of a Contract*

With respect to the first element, the existence of a contract, as to the Melaleuca, Water Way, Ari Way, 78th Lane, and Bass Avenue transactions, the validity of the CPLs is undisputed.  [DE 83, ¶ 6, ¶ 134, ¶ 159, ¶ 118, ¶171].[9]  Moreover, it is undisputed as to all six transactions that ATIF provided the title insurance and that WaMu held a mortgage interest, thereby satisfying the conditions precedent for CPL coverage.

---

[8]   ATIF argues that summary judgment cannot be entered because the FDIC did not movedfor summary judgment on all of ATIF's affirmative defenses.  That is an incorrect statement of law.  ATIF  bears the burden of proof on its affirmative defenses at trial.  *See Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550–51 (11th Cir. 1990) (citations omitted).  Thus, on a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable. *Blue Cross and Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990). Only upon such a showing that the affirmative defense is applicable does the burden shift to plaintiff regarding that affirmative defense. *Id.* at fn. 13. Here, Defendant has not adduced a scintilla of evidence in the record that any of its remaining eleven defenses are applicable and its merely having pled those defenses cannot preclude the entry of summary judgment for Plaintiff.

[9] ATIF disputes the validity of the Battersea CPL, but, as is discussed below with respect to the Battersea transaction, the CPL is deemed an authentic contract by virtue of its agent's invocation of the Fifth Amendment when he was directly asked about the existence of the CPL.  [Rudd Depo., DE 67-165, 59:2-16].

*ii.      Breach*

ATIF disputes whether the CPLs were actually breached.  However, the undisputed record evidence with regard to these six contracts establishes that the contracts were breached.  Under the CPLs, ATIF was liable to reimburse WaMu for its losses in either of two circumstances.  In the first circumstance, ATIF would be liable to reimburse WaMu for losses "arising out of" the issuing agent or approved attorney failing to comply with written closing instructions as they relate to "enforceability and priority of the lien of [the] mortgage  . . . the obtaining of [any] document specifically required . . . and  the collection and payment of funds due."  Relating to "enforceability and priority of the lien" means having to do with the borrower's bona fides, the lien priority, and the right to seek deficiency after foreclosure.  *PTS*, 2013 WL 553556, at *11.  In the second circumstance, ATIF would be liable to reimburse WaMu for losses arising out of "Fraud or dishonesty of [the] Issuing Agent or Approved Attorney in handling [WaMu's] funds or documents in connection with [the] closing."  Thus, to establish breach the FDIC must show a lack of genuine dispute in the record evidence that (1) the closing agents failed to comply with instructions relating to enforcability of the mortgage lein, the requirement to obtain documents, or the requirement to disburse funds properly, or (2) that the agents acted with fraud or dishonesty in handling WaMu's funds or closing documents.[10]  In the CPL context, the Plaintiff can establish the intent aspect of "dishonesty" by showing the agent acted "deliberately, knowingly, willfully blind of facts that would otherwise be obvious, or with reckless disregard for her duties as closing agent during the closing."  *PTS*, 2013 WL 5535561, at *13.

---

[10]  To prove fraud the FDIC must show the closing agent made:  (1) a false statement of material fact; (2) the agent knew or should have known of the falsity of the statement; (3) the agent intended that the false statement induce another's reliance; and (4) WaMu justifiably relied on the false statement to its detriment.  *Congress Park Office Condos II, LLC v. First-Citizens Bank & Trust Co.*, 105 So. 3d 602, 606, fn. 4 (Fla. 4th DCA 2013).

   *iii.*     *Damages From the Breach*

Turning to whether damages flow from the breach, it is undisputed that the borrowers in every transaction defaulted on their mortgages. It is further undisputed that WaMu ultimately sold each of the notes to JPMorgan Chase, incurring, in every instance, a substantial loss. However, to prevail, the FDIC must establish that WaMu's losses arose out of the closing agents' misconduct. The losses only need to have "[arisen] out of" the agent's failure to follow instructions or fraudulent or dishonest conduct, which is less than typical proximate cause. *PTS*, 2013 WL 553556, at *14. As discussed earlier, "arises out of" means "originating from," "having its origin in," "growing out of," "flowing from," "incident to," or "having a connection with." *Id.* Thus, the FDIC can establish the requisite legal nexus by showing that the agents' conduct resulted in WaMu making loans to a borrower who was less bona fide than WaMu bargained for.[11] *Id.*

  (9) Melaleuca

Attorney Michael Rose, ATIF's authorized agent, closed the Melaleuca transaction. The closing instructions stated as follows:

> ". . . There is not to be any other financing, secondary financing, or other charges without express written approval from the Lender. . ."
>
> DISBURSEMENT OF FUNDS SUBJECT TO SATISFACTION OF ALL COMMITMENT CONDITIONS . . .
>
> THIS LOAN IS SUBJECT TO THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA): You are hereby notified that you are the designated Settlement Agent and thereby are responsible for delivering the completed RESPA Settlement Statement – HUD 1 Form in accordance with the requirements of the Real Estate Settlement Procedures Act, and that a condition of our consent to your closing this transaction is that you accept these instructions and complete and deliver the HUD-1 Statement in accordance with these requirements. . .

Finally the closing instructions document stated:

---

[11] ATIF argues that the FDIC cannot prevail at summary judgment on breach, in part, because the "write downs" WaMu took on the loans in the sale to Chase were not due to closing agent malfeasance but because of a decline in values of the subject properties, a market condition which ATIF did not insure. However, that argument fails to consider that in the CPL realm, the standard of causation is less than proximate cause. *PTS*, 2013 WL 553556, at *14.

> *Your firm is responsible for collecting and disbursing all broker fees.  Prepare only one HUD-1 Settlement Statement.*  [DE 71-2].

WaMu transferred $1,322,682.54 to Rose to fund the loan.  Rose prepared a HUD-1 that showed the borrower provided a deposit of $100,000 and brought an additional $349,973.39 cash to close.  [DE 67-28].  The HUD-1 that Rose submitted to WaMu does not reflect the borrower's second mortgage.

Two days before WaMu wired the loan funds into Rose's escrow account, Rose received $187,500 from National City Bank ("NCB") to be put towards the Melaleuca borrower's down payment. Rose issued NCB a HUD-1, which clearly designated the NCB loan as second mortgage. [DE 67-32].

Rose claims to have orally advised WaMu's representatives that the Melaleuca borrower had a second mortgage and that WaMu agreed to the second mortgage on the condition the second mortgage would not disturb WaMu's first priority lien.  [Rose Depo., DE 65-4, pp. 88 – 90]. However, Rose failed to obtain "express written approval" in conformity with the closing instructions, and his closing file does not contain *any* memorialization of the alleged conversation between Rose and WaMu's representatives. *Id.* at 92.

Regardless, even if WaMu gave its consent to modify the closing instructions, Rose recklessly failed to disclose the second mortgage on the HUD-1 he submitted to WaMu.  Line 204 of the HUD-1 form specifically requires that the principal amounts of second mortgages be listed. When asked at his deposition why he did not disclose the second mortgage financing on the HUD-1 he submitted to WaMu, Rose answered that because the NCB mortgage "had already been funded . . . there would not be any reason for me to put it on there." [DE 65-4,  pp. 119 – 122].  Rose did concede in his deposition, however, that by omitting the second mortgage, it appeared that the buyer was paying 20% of the percent price of the transaction in cash, rather than with financing. *Id.* at 125. Thus, even if WaMu consented to secondary financing, Rose's failure to disclose the second

mortgage on the HUD-1 settlement statement he provided WaMu misrepresented the buyer's bona fides as a mortgagor. Rose's reckless disregard in failing to disclose the second mortgage on the HUD-1 amounts to dishonesty in the handling of WaMu's documents. Because the record evidence clearly establishes that Rose's misconduct entitled WaMu to indemnity under the CPL, Plaintiff is entitled to summary judgment on Counts One and Fifteen.

As to the Melaleuca transaction, and as to all the remaining transactions generally, ATIF argues that an agent's fraud or dishonesty in the preparing a HUD-1 is not covered under the CPL because the HUD-1 is not "a WaMu document." [DE 82, p 9]. However, that argument is meritless because it is inconsistent with well-settled Florida law that closing agents are fiduciaries to mortgagees. *PTS*, 2013 WL 5535561 *9, citing *Florida Bar v. Joy*, 679 So.2d 1165, 1167 (Fla. 1996). The closing instructions specifically required Rose to deliver a HUD-1 statement to WaMu. ATIF's understanding of what documents are "WaMu documents" covered by the CPL is overly formalistic and fails to recognize that as WaMu's fiduciary, Rose had an obligation to exercise a requisite level of diligence in all actions he took on WaMu's behalf, including diligence in delivering a correct HUD-1 as required by the closing instructions. The single Michigan case on which ATIF relies, *New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832, 842-44 (Mich. App. 2008) does not apply Florida law, does not consider the fiduciary relationship between a closing agent and mortgagee, and is otherwise unpersuasive.[12]

(10) Water Way; (11) Battersea; (12) Ari Way

ATIF agent attorney Aubrey Rudd served as closing agent for the Water Way, Battersea, and Ari Way transactions. ATIF opposes summary judgment by claiming the FDIC has not presented any admissible evidence that Rudd received WaMu's closing instructions. However, when deposed

---

[12] Moreover, it is unclear that the argument is textually supported. In pertinent part, CPLs state that they indemnify against loss arising out of "[f]raud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings." ATIF improperly assumes that the word "your" modifies the phrase "documents in connection with such closings." Arguably, "your" only modifies "funds."

on these closings, including when asked whether he received the closing instructions, Rudd invoked the Fifth Amendment and refused to answer.  [*See* Rudd Depo., DE 67-165, 10:5-15; 51:19-23; 124:2-5].   As such, his invocation warrants an adverse inference on all matters related to the Water Way, Battersea, and Ari Way transactions.

The Eleventh Circuit recently held that a non-party witness's invocation of the Fifth Amendment in a civil case warrants an adverse inference on a case-by-case basis depending on four, non-exclusive factors.   These factors are: (1) "the nature of the relevant relationships;" (2) "the degree of control of the party over the nonparty witness;" (3) "the compatibility of the interests of the party and non-party witness in the outcome of the litigation;" and (4) "the role of the non-party witness in the litigation."  *Coquina Investments v. T.D. Bank, N.A.*, ----F.3d---- (11th Cir. 2014), 2014 WL 3720301 *6 (July 29, 2014).   Though ATIF did not control Rudd as an employee, their interests are aligned.  By pleading the Fifth Amendment Rudd apparently seeks to avoid criminal liability for mortgage fraud.[13]  Likewise, ATIF benefits from Rudd's invocation because Rudd's silence keeps the FDIC from uncovering facts which would expose ATIF to liability under the CPLs.  Rudd's role as a non-party witness is central in the litigation given that the fact of Rudd's misconduct determines whether ATIF is liable to the FDIC.   Accordingly, Rudd's invocation of the Fifth Amendment warrants an adverse inference as to everything pertaining to the transactions about which he refused to answer questions.

     *i.*    *Water Way*

WaMu transferred $2,717,565.18 to Rudd to fund the buyer's mortgage.  As with the Melaleuca transaction, WaMu expressly disallowed secondary financing in its closing instructions.  [DE 71-39].  The buyer was supposed to have brought $630,162.32 "cash to close," and WaMu funded the loan contingent on its being the only external funding source.  [DE 67-160].   Rudd never

---

[13] It is clear from the deposition transcript that Rudd was known to the U.S. Attorney's Office and had been the target of a Grand Jury subpoena.  [DE 67-165, 19:17-19].

received an escrow deposit from the borrower. [DE 67-157].   Moreover, the HUD-1 Rudd prepared and submitted to WaMu in the Water Way transaction did not disclose a second mortgage. However, Rudd knew the buyer had obtained a second mortgage on the Water Way property that day from NCB in the amount of $328,000 because Rudd personally notarized the borrower's signature on the NCB loan documents and prepared NCB's HUD-1. [DE 67-161].[14]

Rudd clearly violated WaMu's closing instruction that the transaction not be financed with any other external financing.  Moreover, by representing on the HUD-1 that the buyer brought "cash to close" when he knew that was not the case, he acted dishonestly in handling the closing documents.  Because that dishonest representation concerned the borrower's bona fides, ATIF was liable to reimburse WaMu under the CPL.  As such, Plaintiff is entitled to summary judgment on Counts Ten and Twenty Four.

ATIF claims that WaMu knew about NCB's second mortgage because Aubrey Rudd sent both the WaMu and NCB HUD-1 statements to Fleetwood Funding, which ATIF claims acted as WaMu's mortgage broker.  [DE 83, ¶ 143].  However, there is no record evidence supporting that Fleetwood shared the information with WaMu.  Rudd's mere sending both HUD-1s to Fleetwood cannot reasonably undermine the conclusion that Rudd acted dishonestly by failing to directly disclose the NCB second mortgage to WaMu and does not support denying Plaintiff summary judgment on the Water Way Counts.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252. (explaining that to demonstrate a genuine issue for trial, the party opposing summary judgment must show a jury could reasonably find for that party, not merely a "scintilla" of evidence).[15]

---

[14] The NCB Mortgage document bears Rudd's notary stamp and what appears to be his signature.   Rudd pleaded the Fifth when asked if he notarized the document. [DE 67-165, 30:10-16].   ATIF has not introduced any record evidence to rebut that Rudd notarized the document, and therefore, it is deemed that he did.

[15] The additional basis for supporting summary judgment for the FDIC is the fact that Rudd disbursed WaMu's funds to parties not listed on the HUD-1 he submitted to WaMu in violation of the closing instructions.  As established by an unrebutted adverse inference, Rudd issued checks from WaMu's closing funds to ABC investments in the amount of $414,098.50, to G&C Investments Corp, in amounts of $100,000.00 and $314,098.50,

*ii.     Battersea*

The parties dispute whether ATIF issued a CPL in this transaction because ATIF does not have a record of this CPL in its database.  Plaintiff has filed a document from WaMu's Battersea loan file that it purports to be the Battersea CPL.[16]  [DE 67-167].     Though the CPL does not specifically reference the Battersea property, it does bear Rudd's name, his ATIF member number, and his office information.   The document is signed by Margret A. Williams as "Risk Manager" for ATIF. Williams testified at her deposition that not every CPL had transaction specific information on it. [Williams Depo., DE 67-14, 8:9-11].  When asked whether he recognized the document purported to be the Battersea CPL, Rudd invoked the Fifth Amendment.  [Rudd Depo., DE 67-165, 113: 2-16].

ATIF argues that summary judgment must be denied on Counts Eleven and Twenty-Five because the FDIC has not proven the existence of a valid contract.   However, when the record evidence is considered with the adverse inference created by Rudd's invocation of the Fifth Amendment, the dispute is so one-sided that the FDIC must prevail on the question of the contract's validity as a matter of law.

Turning now to whether Rudd's conduct triggered ATIF's liability under the CPL, it is obvious from the record evidence that it did.  The HUD-1 Rudd submitted to WaMu reflects a purchase price of $2,800,000.  [DE 67-174].  WaMu transferred $2,252.417.40 to Rudd to fund the loan. The borrower was to have brought $541,103.70 to closing; the seller was to have received $1,213,355.70 of the proceeds.  As set forth in the closing instructions, the seller's contribution to the sale price could not have exceeded 6% of the lower of the purchase price or appraised price.  [DE 71-42].

---

to TTS Designs, Inc. in the amount of $313,284.00, and to Custom Coatings, LLC in the amount of $100,000.00. [DE 67-165, pp. 92 – 96].

[16] It is undisputed that Rudd issued the ATIF title policy [DE 67-166] on the Battersea property.  [DE 83, ¶ 147].

Rudd's escrow account records show he never received a deposit or funds from the borrower. [*See* DE 67-175]. Furthermore, Rudd's escrow records reveal the sellers were only disbursed $643,154.66 rather than the $1,213,355.70 reflected on the HUD-1. This meant the sellers effectively financed 20% of the $2,800,000 purchase price. As such, Rudd closed the transaction in violation of the closing instructions. Separately, by closing the transaction without the buyer bringing any down payment and by falsely representing on the HUD-1 that the buyer brought $541,103.70 to closing, Rudd's conduct constituted fraud in the handling of the closing documents. Rudd is presumed to have knowingly committed fraud based on his invoking the Fifth Amendment when asked "are you aware of whether there was a . . . straw buyer in the Battersea transaction?" [DE 67-165, 65:3-8].

ATIF challenges the adequacy of making inferences about Rudd's conduct based on his bank records. [DE 83, ¶ 153-54]. Specifically, ATIF contends that because these allegations are only supported by a single bank statement, the possibility that the buyer transferred the money to escrow in the months earlier, or that the remaining money was transferred to the seller in the months following the closing, cannot be ruled out. The objection is unavailing. By citing to Rudd's bank records, Plaintiff has come forward with record evidence to support its claims. Defendant cannot solely rely on conjecture to rebut those allegations; it has to present record evidence of its own that shows that Rudd's conduct is not what it appears to be, which it has not done. Thus, the undisputed record evidence warrants the entry of summary judgment for Plaintiff on Counts Eleven and Twenty-Five.

    *iii.   Ari Way*

WaMu funded a $2,676,257.88 loan for the Ari Way property. The HUD-1 that Rudd created and submitted to WaMu reflected that the purchase price would be $3,500,000.00, that the borrower would be bring $914,082.21 funds to closing, and that $1,185,462.20 would be distributed to the seller. [DE 67-186]. Rudd's escrow account records do not reflect either a disbursement to the

seller from the sale proceeds or a deposit of cash down from the buyer. [DE 67-185]. Rudd took the Fifth Amendment when asked if the buyer brought those funds to closing and when asked if the amount of disbursements stated on the HUD were made to the seller. [DE 67-165, 73:16-21]. Further, Rudd pleaded the Fifth when asked if he knew that information disclosed in the HUD-1 was not accurate at the time he closed the transaction. *Id.* at 65: 2-5. Thus, as a matter of law the record evidence establishes that Rudd submitted dishonestly completed closing documents.

Additionally, Rudd's personal closing files contain a memo from the Seller requesting a $440,000 disbursement to the buyer. When asked whether Rudd made this disbursement he again pleaded the Fifth Amendment, which warrants an adverse inference that he did, in fact, transfer $440,000 from the seller to the buyer. [67-165, 83:7-9]. As such, Rudd failed to follow WaMu's closing instructions, which, like the Water Way transaction, required that the seller's contribution to the sale price not exceed 6% of the lower of the purchase price or appraised price. [DE 71-45]. Rudd willfully ignored that WaMu's buyer brought no funds of his own to the closing, closed a transaction based on a substantially larger seller contribution than authorized, and fabricated the HUD-1 settlement statement given to WaMu. All of these impacted WaMu's expectations about its borrower's bona fides. Accordingly, summary judgment is warranted on Counts Twelve and Twenty-Six.

### (13) 78th Lane

Attorney Ryan Dosen closed the 78th Lane transaction. WaMu transferred $1,027,619.10 to Dosen's escrow account. Its closing instructions mirrored the conditions of the Melaleuca transaction, including the prohibition on subordinate financing.[17] Dosen prepared three separate HUD-1s for the 78th Lane transaction. The HUD-1 Dosen submitted to WaMu did not reflect a

---

[17] Though it is undisputed that Dosen closed the 78th Lane transaction, as with the Rudd transactions, ATIF disputes whether Dosen actually received the closing instructions. Dosen is presumed to have received the instructions because when asked whether he did or not, he pleaded the Fifth. [Dosen Depo., 67-9, 163:9-13]. ATIF has not produced any record evidence to rebut that inference.

second mortgage.  [DE 67-143]. The borrower did in fact obtain a second mortgage on the property from National City Bank in the amount of $124,000.00.  [DE 67-144].  Dosen knew about the second mortgage because he prepared two other HUD-1s that reflected second mortgage financing.  [DE 67-146, DE 67-147].

Despite WaMu's requirement that its funding of the loans was contingent on the buyer not using secondary funding, Dosen closed the transactions anyway.  As such, Dosen's failure to follow WaMu's closing instructions resulted in WaMu funding a loan based on a misrepresentation about the borrower's bona fides, which, in turn, entitled WaMu to be indemnified under the CPL for the losses.  Accordingly, Plaintiff is entitled to summary judgment on Counts Nine and Twenty-Three.

(14) <u>Bass Avenue</u>

Attorney Anette Lopez, as principal of her law office Anette Lopez P.A., closed the Bass Avenue transaction.  WaMu transferred $1,754,149.72 to Lopez to fund the Bass Avenue borrower's mortgage.  WaMu's closing instructions to Lopez for the Bass Avenue transaction mirrored those in the Melaleuca transaction but with an additional instruction limiting the seller's contribution to 6% of the lesser of the purchase price or appraised price.  According to the HUD-1 Lopez caused to be submitted to WaMu, the purchase price of the property would be $2,200,000.00, the borrower would provide $505,355.98 at closing, and seller would receive $1,664,094.37.  [DE 67-199]  Also per the WaMu HUD-1, Lopez's office was to receive no more than $1,645.00 for performing the closing.  *Id.* In actuality, according to a second HUD-1 Lopez's office prepared but did not give to WaMu, the buyer brought nothing to closing and the seller took only about half of *the proceeds* stated in the original HUD-1.  [DE 67-200; DE 67-3, ¶ 11].  Moreover, the seller remitted $481,811.98 back *to the* buyer in the form of a "closing cost credit" and a "boat dock repair credit."  [DE 67-200].  WaMu's HUD-1 did not reflect either credit.  Moreover, Lopez's office made more than $300,000 in disbursements from the loan proceeds to entities not listed on the WaMu HUD-1, including an $11,905.00 disbursement to Anette Lopez P.A.  [DE 71-48].

The undisputed record evidence shows that Lopez closed the Bass Avenue transaction in violation of the closing instructions and acted dishonestly in handling WaMu's funds and documents. Accordingly, Plaintiff is entitled to summary judgment on Counts Thirteen and Twenty-Seven. Lopez allowed the Bass Avenue sale to close despite the fact that the seller's undisclosed credits financed nearly 22% of the transaction and the buyer brought no money down. These actions by Lopez directly implicated WaMu's expectations of the borrower's bona fides. Additionally, Lopez's failure to provide WaMu with an accurate HUD-1 was so grossly negligent as to amount to dishonesty. The HUD-1 Lopez provided WaMu gave the appearance that the transaction would proceed according to instructions. The second HUD-1, however, showed that in actuality the transaction violated several of WaMu's closing conditions. Moreover, Lopez dishonestly handled WaMu's funds, as most clearly evidenced by the fact that she transferred an additional $10,000 to her office out of the loan proceeds without WaMu's permission.

Though, ATIF disputes the authenticity of the second HUD-1 and claims that Lopez did not "execute the checks," it has not shown a genuine disputed issue of material fact in the record. Though Lopez claims not to remember any details about the Bass Avenue closing, the second HUD-1 document was taken from Lopez's closing files and would therefore be admissible as a business record. [Lopez Depo., DE 83-7; 31:3-4]. The fact that Lopez did not issue the checks is unavailing given that it is undisputed both that the checks were issued from her trust account and that she is the principal of the office.

## VI.   THE FDIC IS ENTITLED TO DAMAGES IN THE AMOUNT OF $4,901,973.54 AND TO PREJUDGMENT INTEREST

### a.   Actual Loss

The CPLs obligated ATIF to reimburse WaMu for "actual loss." The FDIC seeks the difference between the unpaid principal balance and the "book value" of what the FDIC recovered on the loans

when it sold them to JP Morgan Chase in 2008.[18]  The Sixth Circuit recently ratified that method of

calculating damages in *JPMorgan Chase Bank v. First Am. Title Ins. Co.*, 750 F.3d 573, 582 (6th Cir.

2014).  The data on which the FDIC relies comes from Chase's loan files, which show the value of

the loan as of the date of sale and the book value of each loan.  The total damages for the transactions

in which Plaintiff is entitled to summary judgment equals $4,901,973.54, broken down as follows:[19]

| Transaction | Unpaid Principal Balance | Less "Book Value" | Equals Actual Loss |
|---|---|---|---|
| Melaleuca | $1,373,267.19 | $881,328.49 | **$491,938.70** |
| Waterway | $2,700,790.47 | $169,954.95 | **$1,070,835.52** |
| Battersea | $2,241,479.60 | $1,628,000 | **$613,479.60** |
| Ari Way | $2,618,986.52 | $1,724,800 | **$894,186.52** |
| 78th Lane | $1,018,828.15 | $483,894.72 | **$534,933.43** |
| Bass Ave | $1,777,107.28 | $480,507.51 | **$1,296,599.77** |

In opposing these damages, ATIF does not endeavor to show a genuine dispute of material

fact within the record evidence.  Rather, ATIF has simply posed a litany of rhetorical questions about

the basis of the amounts including how the book value was calculated and what fees or expenses

were applied to unpaid principal balance.[20]  That approach is unavailing given the undisputed record

evidence.

---

[18] The unpaid principal balance includes the initial principal balance plus fees or expenses such as premiums paid to originate the loan, negative amortization, and collection or delinquency fees.  The figure also reflects any payments to the principal that the borrowers made before they defaulted.  [DE 67-6, ¶ 23].

[19] Contrary to ATIF's arguments, the spreadsheet data is admissible.  The Sixth Circuit found in a CPL case that admission of a similar spreadsheet was proper because the source data were business records that were self-authenticating under Fed. R. Evid. 902(11) and exempted from the prohibition on hearsay under Fed. R. Evid. 803(6). *JPMorgan Chase Bank v. First Am. Title Ins. Co.*, 750 F.3d 573, 582 (6th Cir. 2014).

[20] Additionally, ATIF claims it did not have sufficient notice of the FDIC's damage calculation.  ATIF has filed a Motion to Strike Untimely Disclosed Witnesses [DE 79] and seeks to have the information supplied by Craig Beadle, which establishes damages based on Chase's business records, stricken.  The Court has issued a separate order denying that motion.

The FDIC's loan amounts are based on its investigation of Chase's records concerning the purchased WaMu loans. ATIF's queries about the loan calculation are essentially the equivalent of mere denials about the correctness of the record-supported facts that the FDIC has brought forward. Because ATIF has not met its burden to show "by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial," it has not shown any grounds for why summary judgment must be denied. Accordingly, the FDIC is entitled to recover damages of $4,901,973.54.

    *b. Prejudgment Interest*

Under Florida law, prevailing parties are entitled to prejudgment interest in breach of contract actions where the amount of the claim is liquidated. *Maytronics, Ltd. v. Aqua Vac Systems, Inc.*, 277 F.3d 1317, 1322 (11th Cir. 2002). Interest begins to accrue from the date of loss and runs until judgment is entered. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla. 1985). Here, the date of loss to WaMu runs from the date the closing agents closed the loans in violation of the closing instructions or fraudulently or dishonestly handled WaMu's funds or closing documents as is set forth below:

| Transaction | Date Closed |
|---|---|
| Melaleuca | June 17, 2005 |
| Waterway | November 29, 2006 |
| Battersea | July 12, 2007 |
| Ari Way | July 31, 2007 |
| 78th Lane | June 29, 2007 |
| Bass Avenue | June 18, 2007 |

The Court will require the parties to confer and submit the calculation of prejudgment interest on these six properties consistent with this Order.

## VII    CONCLUSION

For the foregoing reasons, it is

ORDERED THAT

(1) Plaintiff's Motion for Summary Judgment [DE 68] **is GRANTED IN PART AND DENIED IN PART** as set forth above.  Plaintiff is entitled to summary judgment on Counts One, Nine, Ten, Eleven, Twelve, Thirteen, Fifteen, Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Six, and Twenty-Seven.

(2) Defendant's Motion for Summary Judgment [DE 64] is **GRANTED IN PART AND DENIED IN PART** as set forth above.  Defendant is entitled to summary judgment on Counts Two, Three, Four, Five, Six, Seven, Eight, Fourteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, and Twenty-Eight.

(3) The Court shall contemporaneously enter the Judgment reflecting the principal amount and declarations with this Order.  The parties shall file a proposed calculation of prejudgment interest by **September 5, 2014 at 10:00 a.m.**  The judgment will thereafter be amended to reflect Plaintiff's entitlement to prejudgment interest.

(4) All pending motions are **DENIED AS MOOT**.

(5) The **CASE IS CLOSED**.

DONE and ORDERED in Miami, Florida this 3rd day of September, 2014.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record
       Honorable William C. Turnoff